(Slip Opinion) OCTOBER TERM, 2007 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DANFORTH *v.* MINNESOTA

### CERTIORARI TO THE SUPREME COURT OF MINNESOTA

No. 06–8273. Argued October 31, 2007—Decided February 20, 2008

After this Court announced a "new rule" for evaluating the reliability of testimonial statements in criminal cases, see *Crawford* v. *Washington*, 541 U. S. 36, 68–69, petitioner sought state postconviction relief, arguing that he was entitled to a new trial because admitting the victim's taped interview at his trial violated *Crawford*'s rule. The Minnesota trial and appeals courts concluded that *Crawford* did not apply retroactively under *Teague* v. *Lane*, 489 U. S. 288. The State Supreme Court agreed, and also concluded that state courts are not free to give a decision of this Court announcing a new constitutional rule of criminal procedure broader retroactive application than that given by this Court.

*Held: Teague* does not constrain the authority of state courts to give broader effect to new rules of criminal procedure than is required by that opinion. Pp. 4–27.

(a) *Crawford* announced a "new rule"—as defined by *Teague*— because its result "was not *dictated* by precedent existing at the time the defendant's conviction became final," *Teague*, 489 U. S., at 301 (plurality opinion). It was not, however, a rule "of [this Court's] own devising" or the product of its own views about sound policy, *Crawford,* 541 U. S., at 67. Pp. 4–6.

(b) The Court first adopted a "retroactivity" standard in *Linkletter* v. *Walker*, 381 U. S. 618, 629, but later rejected that standard for cases pending on direct review, *Griffith* v. *Kentucky*, 479 U. S. 314, and on federal habeas review, *Teague* v. *Lane*, 489 U. S. 288. Under *Teague,* new constitutional rules of criminal procedure may not be applied retroactively to cases on federal habeas review unless they place certain primary individual conduct beyond the States' power to proscribe or are "watershed" rules of criminal procedure. *Id.,* at 310 (plurality opinion). Pp. 6–11.

(c) Neither *Linkletter* nor *Teague* explicitly or implicitly constrained the States' authority to provide remedies for a broader range of constitutional violations than are redressable on federal habeas. And *Teague* makes clear that its rule was tailored to the federal habeas context and thus had no bearing on whether States could provide broader relief in their own postconviction proceedings. Nothing in Justice O'Connor's general nonretroactivity rule discussion in *Teague* asserts or even intimates that her definition of the class eligible for relief under a new rule should inhibit the authority of a state agency or state court to extend a new rule's benefit to a broader class than she defined. Her opinion also clearly indicates that *Teague*'s general nonretroactivity rule was an exercise of this Court's power to interpret the federal habeas statute. Since *Teague* is based on statutory authority that extends only to federal courts applying a federal statute, it cannot be read as imposing a binding obligation on state courts. The opinion's text and reasoning also illustrate that the rule was meant to apply only to federal courts considering habeas petitions challenging state-court criminal convictions. The federal interest in uniformity in the application of federal law does not outweigh the general principle that States are independent sovereigns with plenary authority to make and enforce their own laws as long as they do not infringe on federal constitutional guarantees. The *Teague* rule was intended to limit federal courts' authority to overturn state convictions not to limit a state court's authority to grant relief for violations of new constitutional law rules when reviewing its own State's convictions. Subsequent cases confirm this view. See, *e.g., Beard* v. *Banks*, 542 U. S. 406, 412. Pp. 11–18.

(d) Neither *Michigan* v. *Payne*, 412 U. S. 47, nor *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167, cast doubt on the state courts' authority to provide broader remedies for federal constitutional violations than mandated by *Teague.* Pp. 18–24.

(e) No federal rule, either implicitly announced in *Teague*, or in some other source of federal law, prohibits States from giving broader retroactive effect to new rules of criminal procedure. Pp. 24–26.

718 N. W. 2d 451, reversed and remanded.

STEVENS, J., delivered the opinion of the Court, in which SCALIA, SOUTER, THOMAS, GINSBURG, BREYER, and ALITO, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which KENNEDY, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 06–8273

STEPHEN DANFORTH, PETITIONER *v.* MINNESOTA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF MINNESOTA

[February 20, 2008]

JUSTICE STEVENS delivered the opinion of the Court.

New constitutional rules announced by this Court that place certain kinds of primary individual conduct beyond the power of the States to proscribe, as well as "watershed" rules of criminal procedure, must be applied in all future trials, all cases pending on direct review, and all federal habeas corpus proceedings. All other new rules of criminal procedure must be applied in future trials and in cases pending on direct review, but may not provide the basis for a federal collateral attack on a state-court conviction. This is the substance of the "*Teague* rule" described by Justice O'Connor in her plurality opinion in *Teague* v. *Lane*, 489 U. S. 288 (1989).[1] The question in this case is whether *Teague* constrains the authority of state courts to

_____

[1] Although *Teague* was a plurality opinion that drew support from only four Members of the Court, the *Teague* rule was affirmed and applied by a majority of the Court shortly thereafter. See *Penry* v. *Lynaugh*, 492 U. S. 302, 313 (1989) ("Because Penry is before us on collateral review, we must determine, as a threshold matter, whether granting him the relief he seeks would create a new rule. Under *Teague*, new rules will not be applied or announced in cases on collateral review unless they fall into one of two exceptions" (citation and internal quotation marks omitted)).

give broader effect to new rules of criminal procedure than is required by that opinion.  We have never suggested that it does, and now hold that it does not.

## I

In 1996 a Minnesota jury found petitioner Stephen Danforth guilty of first-degree criminal sexual conduct with a minor.  See Minn. Stat. §609.342, subd. 1(a) (1994). The 6-year-old victim did not testify at trial, but the jury saw and heard a videotaped interview of the child.  On appeal from his conviction, Danforth argued that the tape's admission violated the Sixth Amendment's guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  Applying the rule of admissibility set forth in *Ohio* v. *Roberts*, 448 U. S. 56 (1980), the Minnesota Court of Appeals concluded that the tape "was sufficiently reliable to be admitted into evidence," and affirmed the conviction.  *State* v. *Danforth*, 573 N. W. 2d 369, 375 (1997).  The conviction became final in 1998 when the Minnesota Supreme Court denied review and petitioner's time for filing a writ of certiorari elapsed.  See *Caspari* v. *Bohlen*, 510 U. S. 383, 390 (1994).

After petitioner's conviction had become final, we announced a "new rule" for evaluating the reliability of testimonial statements in criminal cases.  In *Crawford* v. *Washington*, 541 U. S. 36, 68–69 (2004), we held that where testimonial statements are at issue, "the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."

Shortly thereafter, petitioner filed a state postconviction petition, in which he argued that he was entitled to a new trial because the admission of the taped interview violated the rule announced in *Crawford*.  Applying the standards set forth in *Teague,* the Minnesota trial court and the

Minnesota Court of Appeals concluded that *Crawford* did not apply to petitioner's case. The State Supreme Court granted review to consider two arguments: (1) that the lower courts erred in holding that *Crawford* did not apply retroactively under *Teague;* and (2) that the state court was "free to apply a broader retroactivity standard than that of *Teague*," and should apply the *Crawford* rule to petitioner's case even if federal law did not require it to do so. 718 N. W. 2d 451, 455 (2006). The court rejected both arguments. *Ibid.*

With respect to the second, the Minnesota court held that our decisions in *Michigan* v. *Payne*, 412 U. S. 47 (1973), *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167 (1990), and *Teague* itself establish that state courts are not free to give a Supreme Court decision announcing a new constitutional rule of criminal procedure broader retroactive application than that given by this Court.[2] The Minnesota Court acknowledged that other state courts had held that *Teague* does not apply to state postconviction proceedings,[3] but concluded that "we are not free to

—————————

[2] The relevant passage in the Minnesota Supreme Court opinion states:

"Danforth argues that *Teague* dictates the limits of retroactive application of new rules only in *federal* habeas corpus proceedings and does not limit the retroactive application of new rules in *state* postconviction proceedings. Danforth is incorrect when he asserts that state courts are free to give a Supreme Court decision of federal constitutional criminal procedure broader retroactive application than that given by the Supreme Court. . . . In light of *Payne* and *American Trucking Associations*, we cannot apply state retroactivity principles when determining the retroactivity of a new rule of federal constitutional criminal procedure if the Supreme Court has already provided relevant federal principles." 718 N. W. 2d 451, 456 (2006).

[3] See, *e.g., Daniels* v. *State*, 561 N. E. 2d 487, 489 (Ind. 1990); *State ex rel. Taylor* v. *Whitley*, 606 So. 2d 1292, 1296–1297 (La. 1992); *State* v. *Whitfield*, 107 S. W. 3d 253, 266–268 (Mo. 2003); *Colwell* v. *State*, 118 Nev. 807, 816–819, 59 P. 3d 463, 470–471 (2002) *(per curiam); Cowell* v. *Leapley*, 458 N. W. 2d 514, 517–518 (S. D. 1990).

fashion our own standard of retroactivity for *Crawford*." 718 N. W. 2d, at 455–457.

Our recent decision in *Whorton* v. *Bockting*, 549 U. S. ___ (2007)*,* makes clear that the Minnesota court correctly concluded that federal law does not *require* state courts to apply the holding in *Crawford* to cases that were final when that case was decided. Nevertheless, we granted certiorari, 550 U. S. ___ (2007), to consider whether *Teague* or any other federal rule of law *prohibits* them from doing so.[4]

## II

We begin with a comment on the source of the "new rule" announced in *Crawford*. For much of our Nation's history, federal constitutional rights—such as the Sixth Amendment confrontation right at issue in *Crawford*— were not binding on the States. Federal law, in fact, imposed no constraints on the procedures that state courts could or should follow in imposing criminal sanctions on their citizens. Neither the Federal Constitution as originally ratified nor any of the Amendments added by the Bill of Rights in 1791 gave this Court or any other federal-court power to review the fairness of state criminal procedures. Moreover, before 1867 the statutory authority of federal district courts to issue writs of habeas corpus did not extend to convicted criminals in state custody. See Act of Feb. 5, 1867, ch. 28, §1, 14 Stat. 385.

The ratification of the Fourteenth Amendment radically changed the federal courts' relationship with state courts. That Amendment, one of the post-Civil War Reconstruc-

---

[4] We note at the outset that this case does not present the questions whether States are required to apply "watershed" rules in state post-conviction proceedings, whether the *Teague* rule applies to cases brought under 28 U. S. C. §2255 (2000 ed., Supp. V), or whether Congress can alter the rules of retroactivity by statute. Accordingly, we express no opinion on these issues.

tion Amendments ratified in 1868, is the source of this Court's power to decide whether a defendant in a state proceeding received a fair trial—*i.e.*, whether his deprivation of liberty was "without due process of law." U. S. Const., Amdt. 14, §1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law"). In construing that Amendment, we have held that it imposes minimum standards of fairness on the States, and requires state criminal trials to provide defendants with protections "implicit in the concept of ordered liberty." *Palko* v. *Connecticut,* 302 U. S. 319, 325 (1937).

Slowly at first, and then at an accelerating pace in the 1950's and 1960's, the Court held that safeguards afforded by the Bill of Rights—including a defendant's Sixth Amendment right "to be confronted with the witnesses against him"—are incorporated in the Due Process Clause of the Fourteenth Amendment and are therefore binding upon the States. See *Gideon* v. *Wainwright,* 372 U. S. 335 (1963) (applying the Sixth Amendment right to counsel to the States); *Pointer* v. *Texas,* 380 U. S. 400, 403 (1965) (holding that "the Sixth Amendment's right of an accused to confront the witnesses against him is likewise a fundamental right and is made obligatory on the States by the Fourteenth Amendment"). Our interpretation of that basic Sixth Amendment right of confrontation has evolved over the years.

In *Crawford* we accepted the petitioner's argument that the interpretation of the Sixth Amendment right to confrontation that we had previously endorsed in *Roberts*, 448 U. S. 56, needed reconsideration because it "stray[ed] from the original meaning of the Confrontation Clause." 541 U. S., at 42. We "turn[ed] to the historical background of the Clause to understand its meaning," *id.,* at 43, and relied primarily on legal developments that had occurred prior to the adoption of the Sixth Amendment to derive the correct interpretation. *Id.,* at 43–50. We held that the

"Constitution prescribes a procedure for determining the reliability of testimony in criminal trials, and we, no less than the state courts, lack authority to replace it with one of our own devising." *Id.,* at 67.

Thus, our opinion in *Crawford* announced a "new rule"—as that term is defined in *Teague*—because the result in that case "was not *dictated* by precedent existing at the time the defendant's conviction became final," *Teague*, 489 U. S., at 301 (plurality opinion). It was not, however, a rule "of our own devising" or the product of our own views about sound policy.

## III

Our decision today must also be understood against the backdrop of our somewhat confused and confusing "retroactivity" cases decided in the years between 1965 and 1987. Indeed, we note at the outset that the very word "retroactivity" is misleading because it speaks in temporal terms. "Retroactivity" suggests that when we declare that a new constitutional rule of criminal procedure is "nonretroactive," we are implying that the right at issue was not in existence prior to the date the "new rule" was announced. But this is incorrect. As we have already explained, the source of a "new rule" is the Constitution itself, not any judicial power to create new rules of law. Accordingly, the underlying right necessarily pre-exists our articulation of the new rule. What we are actually determining when we assess the "retroactivity" of a new rule is not the temporal scope of a newly announced right, but whether a violation of the right that occurred prior to the announcement of the new rule will entitle a criminal defendant to the relief sought.[5]

------

[5] It may, therefore, make more sense to speak in terms of the "redressability" of violations of new rules, rather than the "retroactivity" of such rules. Cf. *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167, 201 (1990) (SCALIA, J., concurring in judgment) ("The very framing of

Originally, criminal defendants whose convictions were final were entitled to federal habeas relief only if the court that rendered the judgment under which they were in custody lacked jurisdiction to do so. *Ex parte Watkins*, 3 Pet. 193 (1830); *Ex parte Lange*, 18 Wall. 163, 176 (1874); *Ex parte Siebold*, 100 U. S. 371, 376–377 (1880).[6] In 1915, the realm of violations for which federal habeas relief would be available to state prisoners was expanded to include state proceedings that "deprive[d] the accused of his life or liberty without due process of law." *Frank* v. *Mangum*, 237 U. S. 309, 335 (1915). In the early 1900's, however, such relief was only granted when the constitutional violation was so serious that it effectively rendered the conviction void for lack of jurisdiction. See, *e.g., Moore* v. *Dempsey*, 261 U. S. 86 (1923) (mob domination of a trial); *Mooney* v. *Holohan*, 294 U. S. 103 (1935) *(per curiam)* (knowing use of perjured testimony by the prosecution); *Waley* v. *Johnston*, 316 U. S. 101 (1942) *(per curiam)* (coerced guilty plea).[7]

––––––––––

the issue that we purport to decide today—whether our decision in [*American Trucking Assns., Inc.* v. *Scheiner,* 483 U. S. 266 (1987),] shall 'apply' retroactively—presupposes [an incorrect] view of our decisions as *creating* the law, as opposed to *declaring* what the law already is"). Unfortunately, it would likely create, rather than alleviate, confusion to change our terminology at this point. Accordingly, we will continue to utilize the existing vocabulary, despite its shortcomings.

 [6] Although our post-1867 cases reflected a "softening" of the concept of jurisdiction to embrace claims that the statute under which the petitioner had been convicted was unconstitutional or that the detention was based on an illegally imposed sentence, the Court adhered to the basic rule that habeas was unavailable to review claims of constitutional error that did not go to the trial court's jurisdiction. See Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 471, 483–484 (1963); Hart, The Supreme Court 1958 Term, Foreword: The Time Chart of the Justices, 73 Harv. L. Rev. 84, 103–104 (1959).

 [7] "[I]n *Waley* v. *Johnston*, 316 U. S. 101 (1942), the Court openly discarded the concept of jurisdiction—by then more [of] a fiction than

The serial incorporation of the Amendments in the Bill of Rights during the 1950's and 1960's imposed more constitutional obligations on the States and created more opportunity for claims that individuals were being convicted without due process and held in violation of the Constitution. Nevertheless, until 1965 the Court continued to construe every constitutional error, including newly announced ones, as entitling state prisoners to relief on federal habeas. "New" constitutional rules of criminal procedure were, without discussion or analysis, routinely applied to cases on habeas review. See, *e.g., Jackson* v. *Denno*, 378 U. S. 368 (1964); *Gideon,* 372 U. S. 335; *Eskridge* v. *Washington Bd. of Prison Terms and Paroles*, 357 U. S. 214 (1958) *(per curiam).*

In *Linkletter* v. *Walker*, 381 U. S. 618 (1965), the Court expressly considered the issue of "retroactivity" for the first time. Adopting a practical approach, we held that the retroactive effect of each new rule should be determined on a case-by-case basis by examining the purpose of the rule, the reliance of the States on the prior law, and the effect on the administration of justice of retroactive application of the rule. *Id.,* at 629. Applying those considerations to the exclusionary rule announced in *Mapp* v. *Ohio*, 367 U. S. 643 (1961), we held that the *Mapp* rule would not be given retroactive effect; it would not, in other words, be applied to convictions that were final before the date of the *Mapp* decision.[8] *Linkletter*, 381 U. S., at 636–

––––––––––

anything else—as a touchstone of the availability of federal habeas review, and acknowledged that such review is available for claims of disregard of the constitutional rights of the accused . . . ." *Wainwright* v. *Sykes*, 433 U. S. 72, 79 (1977) (internal quotation marks omitted).

[8]*Linkletter* arose in the context of a denial of federal habeas relief, so its holding was "necessarily limited to convictions which had become final by the time *Mapp* . . . [was] rendered." *Johnson* v. *New Jersey*, 384 U. S. 719, 732 (1966). We noted in *Linkletter* that *Mapp* was being applied to cases that were still pending on direct review at the time it was decided, so the issue before us was expressly limited to "whether

640.

During the next four years, application of the *Linkletter* standard produced strikingly divergent results. As Justice Harlan pointed out in his classic dissent in *Desist* v. *United States,* 394 U. S. 244, 257 (1969), one new rule was applied to all cases subject to direct review, *Tehan* v. *United States ex rel. Shott,* 382 U. S. 406 (1966); another to all cases in which trials had not yet commenced, *Johnson* v. *New Jersey,* 384 U. S. 719 (1966); another to all cases in which tainted evidence had not yet been introduced at trial, *Fuller* v. *Alaska,* 393 U. S. 80 (1968) *(per curiam);* and still others only to the party involved in the case in which the new rule was announced and to all future cases in which the proscribed official conduct had not yet occurred, *Stovall* v. *Denno,* 388 U. S. 293 (1967); *DeStefano* v. *Woods,* 392 U. S. 631 (1968) *(per curiam).* He reasonably questioned whether such decisions "may properly be considered the legitimate products of a court of law, rather than the commands of a super-legislature." 394 U. S., at 259.

Justice Harlan's dissent in *Desist*, buttressed by his even more searching separate opinion in *Mackey* v. *United States*, 401 U. S. 667, 675 (1971) (opinion concurring in judgments in part and dissenting in part), and scholarly criticism,[9] laid the groundwork for the eventual demise of the *Linkletter* standard. In *Griffith* v. *Kentucky*, 479 U. S. 314 (1987), the Court rejected as "unprincipled and inequi-

_____

the exclusionary principle enunciated in *Mapp* applies to state court convictions which had become final before rendition of our opinion." 381 U. S., at 622 (footnote omitted). Shortly thereafter, however, we held that the three-pronged *Linkletter* analysis should be applied both to convictions that were final before rendition of our opinions and to cases that were still pending on direct review. See *Johnson,* 384 U. S., at 732; *Stovall* v. *Denno*, 388 U. S. 293 (1967).

[9] See, *e.g.*, Haddad, "Retroactivity Should be Rethought": A Call for the End of the Linkletter Doctrine, 60 J. Crim. L., C. & P. S. 417 (1969).

table," the application of the *Linkletter* standard to cases pending on direct review. In *Teague*, Justice O'Connor reaffirmed *Griffith'*s rejection of the *Linkletter* standard for determining the "retroactive" applicability of new rules to state convictions that were not yet final and rejected the *Linkletter* standard for cases pending on federal habeas review. She adopted (with a significant modification) the approach advocated by Justice Harlan for federal collateral review of final state judgments.

Justice O'Connor endorsed a general rule of nonretroactivity for cases on collateral review, stating that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." 489 U. S., at 310 (plurality opinion). The opinion defined two exceptions: rules that render types of primary conduct "'beyond the power of the criminal law-making authority to proscribe,'" *id.*, at 311, and "watershed" rules that "implicate the fundamental fairness of the trial," *id.*, at 311, 312, 313.[10]

It is clear that *Linkletter* and then *Teague* considered what constitutional violations may be remedied on federal habeas.[11] They did not define the scope of the "new" constitutional rights themselves. Nor, as we shall explain, did *Linkletter* or *Teague* (or any of the other cases relied upon by respondent and the Minnesota Supreme Court) speak to the entirely separate question whether States can provide remedies for violations of these rights in their own postconviction proceedings.

––––––––––

[10] Rules of the former type "are more accurately characterized as substantive rules not subject to [*Teague*'s] bar." *Schriro* v. *Summerlin*, 542 U. S. 348, 352, n. 4 (2004).

[11] Similarly, *Johnson*, and *Griffith* v. *Kentucky,* 479 U. S. 314 (1987), defined the scope of constitutional violations that would be remedied on direct appeal.

## IV

Neither *Linkletter* nor *Teague* explicitly or implicitly constrained the authority of the States to provide remedies for a broader range of constitutional violations than are redressable on federal habeas. *Linkletter* spoke in broad terms about the retroactive applicability of new rules to state convictions that had become final prior to our announcement of the rules. Although *Linkletter* arose on federal habeas, the opinion did not rely on that procedural posture as a factor in its holding or analysis. Arguably, therefore, the approach it established might have been applied with equal force to both federal and state courts reviewing final state convictions. But we did not state—and the state courts did not conclude—that *Linkletter* imposed such a limitation on the States.[12]

A year after deciding *Linkletter*, we granted certiorari in *Johnson* to address the retroactivity of the rules announced in *Escobedo* v. *Illinois*, 378 U. S. 478 (1964), and *Miranda* v. *Arizona*, 384 U. S. 436 (1966). Applying the standard announced in *Linkletter*, we held that those rules should be applied only to trials that began after the respective dates of those decisions; they were given no retro-

---

[12]The dissent is correct that at least one "thoughtful legal scholar" believed that *Linkletter* did preclude States from applying new constitutional rules more broadly than our cases required. *Post*, at 4 (citing Mishkin, Foreword: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56, 91, n. 132 (1965)). Notably, this comment was made in the context of an attack on *Linkletter*'s prospective approach as inconsistent with the idea that judges are "bound by a body of fixed, overriding law." Mishkin, 79 Harv. L. Rev., at 62. Moreover, the footnote cited by the dissent concludes with a statement that "the reservation to the states of the power to apply [new rules] to all convictions, . . . is . . . the preferable pattern." *Id.,* at 91, n. 132. In all events, even if *Linkletter* and its progeny rested on the assumption that "new rules" of constitutional law did not exist until announced by this Court, that view of the law was rejected when we endorsed Justice Harlan's analysis of retroactivity.

active effect beyond the parties in *Miranda* and *Escobedo* themselves.[13]

Notably, the Oregon Supreme Court decided to give retroactive effect to *Escobedo* despite our holding in *Johnson*. In *State* v. *Fair*, 263 Ore. 383, 502 P. 2d 1150 (1972), the Oregon court noted that it was continuing to apply *Escobedo* retroactively and correctly stated that "we are free to choose the degree of retroactivity or prospectivity which we believe appropriate to the particular rule under consideration, so long as we give federal constitutional rights at least as broad a scope as the United States Supreme Court requires." 263 Ore., at 387–388, 502 P. 2d, at 1152. In so holding, the Oregon court cited our language in *Johnson* that "'States are still entirely free to effectuate under their own law stricter standards than those we have laid down and to apply those standards in a broader range of cases than is required by this decision.'" 263 Ore., at 386, 502 P. 2d, at 1151 (quoting *Johnson*, 384 U. S., at 733).[14]

———————

[13] That same year, we similarly denied retroactive effect to the rule announced in *Griffin* v. *California*, 380 U. S. 609 (1965), prohibiting prosecutorial comment on the defendant's failure to testify. See *Tehan* v. *United States ex rel. Shott*, 382 U. S. 406 (1966). Shortly thereafter, in a case involving a *Griffin* error, we held for the first time that there are some constitutional errors that do not require the automatic reversal of a conviction. *Chapman* v. *California*, 386 U. S. 18, 22 (1967). Both *Shott* and *Chapman* protected the State of California from a potentially massive exodus of state prisoners because their prosecutors and judges had routinely commented on a defendant's failure to testify.

[14] Although the plain meaning of this language in *Johnson* is that a state creating its own substantive standards can be as generous with their retroactive effect as it wishes, courts and commentators both before and after *Teague* v. *Lane,* 489 U. S. 288 (1989), cited this language in support of the proposition that state courts "may apply new constitutional standards 'in a broader range of cases than is required' by th[is] Court's decision not to apply the standards retroactively." *Colwell* v. *State*, 118 Nev. 807, 818, 59 P. 3d 463, 470–471 (2002) *(per curiam);* see also Stith, A Contrast of State and Federal Court Author-

Like *Linkletter*, *Teague* arose on federal habeas. Unlike in *Linkletter*, however, this procedural posture was not merely a background fact in *Teague*. A close reading of the *Teague* opinion makes clear that the rule it established was tailored to the unique context of federal habeas and therefore had no bearing on whether States could provide broader relief in their own postconviction proceedings than required by that opinion. Because the case before us now does not involve either of the "*Teague* exceptions," it is Justice O'Connor's discussion of the general rule of nonretroactivity that merits the following three comments.

First, not a word in Justice O'Connor's discussion—or in either of the opinions of Justice Harlan that provided the blueprint for her entire analysis—asserts or even intimates that her definition of the class eligible for relief under a new rule should inhibit the authority of any state agency or state court to extend the benefit of a new rule to a broader class than she defined.

Second, Justice O'Connor's opinion clearly indicates that *Teague*'s general rule of nonretroactivity was an exercise of this Court's power to interpret the federal habeas statute. Chapter 153 of Title 28 of the U. S. Code gives federal courts the authority to grant "writs of habeas corpus," but leaves unresolved many important questions about the scope of available relief. This Court has interpreted that congressional silence—along with the statute's command to dispose of habeas petitions "as law and justice require," 28 U. S. C. §2243—as an authorization to adjust the scope

_____

ity to Grant Habeas Relief, 38 Val. U. L. Rev. 421, 443 (2004). Thirty years after deciding *State* v. *Fair*, the Oregon Supreme Court "disavowed" this analysis based on our decisions in *Oregon* v. *Hass*, 420 U. S. 714 (1975), and *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167. *Page* v. *Palmateer*, 336 Ore. 379, 84 P. 3d 133 (2004). As we explain *infra*, at 19, 20, its reliance on those cases was misplaced, and its decision to change course was therefore misguided.

of the writ in accordance with equitable and prudential
considerations. See, *e.g., Brecht* v. *Abrahamson*, 507 U. S.
619 (1993) (harmless-error standard); *McCleskey* v. *Zant*,
499 U. S. 467 (1991) (abuse-of-the-writ bar to relief);
*Wainwright* v. *Sykes*, 433 U. S. 72 (1977) (procedural
default); *Stone* v. *Powell*, 428 U. S. 465 (1976) (cognizabil-
ity of Fourth Amendment claims). *Teague* is plainly
grounded in this authority, as the opinion expressly situ-
ated the rule it announced in this line of cases adjusting
the scope of federal habeas relief in accordance with equi-
table and prudential considerations. 489 U. S., at 308
(plurality opinion) (citing, *inter alia*, *Wainwright* and
*Stone*).[15]   Since *Teague* is based on statutory authority

---

[15] Subsequent decisions have characterized *Teague* in a similar fash-
ion. See, *e.g., Brecht*, 507 U. S., at 633, 634 (stating that "in defining
the scope of the writ, we look first to the considerations underlying our
habeas jurisprudence," and identifying *Teague* as an example). And
individual Justices have been even more explicit. See *Day* v.
*McDonough*, 547 U. S. 198, 214 (2006) (SCALIA, J., dissenting) (describ-
ing, *inter alia*, the *Teague* rule as having been "created by the habeas
courts themselves, in the exercise of their traditional equitable discre-
tion . . . because [it was] seen as necessary to protect the interests of
comity and finality that federal collateral review of state criminal
proceedings necessarily implicates"); *Withrow* v. *Williams*, 507 U. S.
680, 699 (1993) (O'Connor, J., concurring in part and dissenting in part)
(listing *Teague* as one illustration of the principle that "federal courts
exercising their habeas powers may refuse to grant relief on certain
claims because of 'prudential concerns' such as equity and federalism");
507 U. S., at 718 (SCALIA, J., concurring in part and dissenting in part)
(stating that *Teague* and other "gateways through which a habeas
petitioner must pass before proceeding to the merits of a constitutional
claim" are "grounded in the equitable discretion of habeas courts"
(internal quotation marks and brackets omitted)); *Teague*, 489 U. S., at
317 (White, J., concurring in part and concurring in judgment) (charac-
terizing *Teague* as a decision "construing the reach of the habeas corpus
statutes" and contrasting it with *Griffith*, which "appear[s] to have
constitutional underpinnings"); 489 U. S., at 332–333 (Brennan, J.,
dissenting) (characterizing *Teague* as an unwarranted change in "[this
Court's] interpretation of the federal habeas statute"); see also *Mackey*
v. *United States,* 401 U. S. 667, 684 (1971) (Harlan, J., concurring in

that extends only to federal courts applying a federal statute, it cannot be read as imposing a binding obligation on state courts.

Third, the text and reasoning of Justice O'Connor's opinion also illustrate that the rule was meant to apply only to federal courts considering habeas corpus petitions challenging state-court criminal convictions. Justice O'Connor made numerous references to the "Great writ" and the "writ," and expressly stated that "[t]he relevant frame of reference" for determining the appropriate retroactivity rule is defined by "the purposes for which the writ of habeas corpus is made available." 489 U. S., at 306 (plurality opinion). Moreover, she justified the general rule of nonretroactivity in part by reference to comity and respect for the finality of state convictions. Federalism and comity considerations are unique to *federal* habeas review of state convictions. See, *e.g., State* v. *Preciose*, 129 N. J. 451, 475, 609 A. 2d 1280, 1292 (1992) (explaining that comity and federalism concerns "simply do not apply when this Court reviews procedural rulings by our lower courts"). If anything, considerations of comity militate in favor of allowing state courts to grant habeas relief to a broader class of individuals than is required by *Teague*. And while finality is, of course, implicated in the context of state as well as federal habeas, finality of state convictions is a *state* interest, not a federal one. It is a matter that States should be free to evaluate, and weigh the importance of, when prisoners held in state custody are seeking a remedy for a violation of federal rights by their lower courts.

The dissent correctly points out that *Teague* was also grounded in concerns over uniformity and the inequity inherent in the *Linkletter* approach. There is, of course, a

---

judgments in part and dissenting in part) (describing the problem of retroactivity as "a problem as to the scope of the habeas writ").

federal interest in "reducing the inequity of haphazard retroactivity standards and disuniformity in the application of federal law." *Post*, at 12. This interest in uniformity, however, does not outweigh the general principle that States are independent sovereigns with plenary authority to make and enforce their own laws as long as they do not infringe on federal constitutional guarantees. The fundamental interest in federalism that allows individual States to define crimes, punishments, rules of evidence, and rules of criminal and civil procedure in a variety of different ways—so long as they do not violate the Federal Constitution—is not otherwise limited by any general, undefined federal interest in uniformity. Nonuniformity is, in fact, an unavoidable reality in a federalist system of government. Any State could surely have adopted the rule of evidence defined in *Crawford* under state law even if that case had never been decided. It should be equally free to give its citizens the benefit of our rule in any fashion that does not offend federal law.

It is thus abundantly clear that the *Teague* rule of nonretroactivity was fashioned to achieve the goals of federal habeas while minimizing federal intrusion into state criminal proceedings. It was intended to limit the authority of federal courts to overturn state convictions—not to limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own State's convictions.[16]

───────────

[16] The lower federal courts have also applied the *Teague* rule to motions to vacate, set aside, or correct a federal sentence pursuant to 28 U. S. C. §2255 (2000 ed., Supp. V). Much of the reasoning applicable to applications for writs of habeas corpus filed pursuant to §2254 seems equally applicable in the context of §2255 motions. See *United States* v. *Hayman*, 342 U. S. 205 (1952) (explaining that §2255 was enacted as a functional equivalent for habeas corpus to allow federal prisoners to bring a collateral attack in the court that imposed the sentence rather than a court that happened to be near the prison).

Our subsequent cases, which characterize the *Teague* rule as a standard limiting only the scope of *federal* habeas relief, confirm that *Teague* speaks only to the context of federal habeas. See, *e.g., Beard* v. *Banks*, 542 U. S. 406, 412 (2004) ("*Teague*'s nonretroactivity principle acts as a limitation on the power of federal courts to grant habeas corpus relief to state prisoners" (internal quotation marks, ellipsis, and brackets omitted)); *Caspari*, 510 U. S., at 389 ("The *[Teague]* nonretroactivity principle *prevents* a federal court from granting habeas corpus relief to a state prisoner based on a rule announced after his conviction and sentence became final").

It is also noteworthy that for many years following *Teague*, state courts almost universally understood the *Teague* rule as binding only federal habeas courts, not state courts. See, *e.g., Cowell* v. *Leapley*, 458 N. W. 2d 514 (S. D. 1990); *Preciose*, 129 N. J. 451, 609 A. 2d 1280; *State ex rel. Schmelzer* v. *Murphy*, 201 Wis. 2d 246, 256–257, 548 N. W. 2d 45, 49 (1996) (choosing of its own volition to adopt the *Teague* rule); but see *State* v. *Egelhoff*, 272 Mont. 114, 900 P. 2d 260 (1995).[17]  Commentators were similarly confident that *Teague*'s "restrictions appl[ied] only to federal habeas cases," leaving States free to "determine whether to follow the federal courts' rulings on retroactivity or to fashion rules which respond to the unique concerns of that state."  Hutton, Retroactivity in the States: The Impact of *Teague* v. *Lane* on State Postconviction Remedies, 44 Ala. L. Rev. 421, 423–424, 422–423 (1993).

In sum, the *Teague* decision limits the kinds of constitutional violations that will entitle an individual to relief on

––––––––––

[17] Today, the majority of state courts still read *Teague* this way. As far as we can tell, only three States—Minnesota, Oregon, and Montana—have adopted a contrary view. See *Page*, 336 Ore. 379, 84 P. 3d 133; *Egelhoff*, 272 Mont. 114, 900 P. 2d 260.

federal habeas, but does not in any way limit the authority
of a state court, when reviewing its own state criminal
convictions, to provide a remedy for a violation that is
deemed "nonretroactive" under *Teague*.

## V

The State contends that two of our prior decisions—
*Michigan* v. *Payne* and *American Trucking Assns., Inc.* v.
*Smith*—cast doubt on state courts' authority to provide
broader remedies for federal constitutional violations than
mandated by *Teague*. We disagree.

## A

In *Michigan* v. *Payne*, 412 U. S. 47, we considered the
retroactivity of the rule prohibiting "vindictive" resentenc-
ing that had been announced in our opinion in *North
Carolina* v. *Pearce*, 395 U. S. 711, 723–726 (1969).[18] Rely-
ing on the approach set forth in *Linkletter* and *Stovall,* we
held that the *Pearce* rule did not apply because Payne's
resentencing had occurred prior to *Pearce*'s date of deci-
sion.[19] We therefore reversed the judgment of the Michi-
gan Supreme Court, which had applied *Pearce* retroac-

--------

[18] In *Pearce*, we held:

"[W]henever a judge imposes a more severe sentence upon a defendant
after a new trial, the reasons for his doing so must affirmatively ap-
pear. Those reasons must be based upon objective information concern-
ing identifiable conduct on the part of the defendant occurring after the
time of the original sentencing proceeding. And the factual data upon
which the increased sentence is based must be made part of the record,
so that the constitutional legitimacy of the increased sentence may be
fully reviewed on appeal." 395 U. S., at 726.

As the concurrence pointed out, some States already provided equiva-
lent or broader protection against vindictive sentencing. See *id.,* at
733–734, n. 4 (opinion of Douglas, J.).

[19] Given the fact that Payne's appeal was still pending on that date,
however, the result would have been different and the views of the
dissenting Justices would have prevailed if the case had been decided
after our decision in *Teague*.

tively, and remanded for further proceedings.

At first blush the fact that we reversed the judgment of the Michigan court appears to lend support to the view that state courts may not give greater retroactive effect to new rules announced by this Court than we expressly authorize. But, as our opinion in *Payne* noted, the Michigan Supreme Court had applied the *Pearce* rule retroactively "'pending clarification'" by this Court. 412 U. S., at 49. As the Michigan Court explained, it had applied the new rule in the case before it in order to give guidance to Michigan trial courts concerning what it regarded as an ambiguity in *Pearce*'s new rule.[20] The Michigan Court did not purport to make a definitive ruling on the retroactivity of *Pearce;* nor did it purport to apply a broader state rule of retroactivity than required by federal law. Our opinion in *Payne* did not require the Michigan Supreme Court to modify its disposition of the case; it simply remanded for further proceedings after providing the clarification that the Michigan Court sought. Most significantly, other than

———————

[20] The relevant footnote in the Michigan Supreme Court's opinion explained:

"The United States Supreme Court has not yet decided whether *Pearce* is to be applied retroactively. Although the Court twice granted certiorari to consider the question, in each case the writ was subsequently dismissed as improvidently granted. *Moon* v. *Maryland, cert granted* (1969), 395 US 975, *writ dismissed* (1970), 398 US 319; *Odom* v. *United States, cert granted* (1970), 399 US 904, *writ dismissed* (1970), 400 US 23. We decline to predict the high Court's answer to the question of *Pearce's* retroactive or prospective application, but we will apply *Pearce* in the present case in order to instruct our trial courts as to the Michigan interpretation of an ambiguous portion of *Pearce*, discussed *Infra*, pending clarification by the United States Supreme Court." *People* v. *Payne*, 386 Mich. 84, 90–91, n. 3, 191 N. W. 2d 375, 378, n. 2 (1971) (citations omitted). See also Reply Brief for Petitioner in *Michigan* v. *Payne*, O. T. 1972, No. 71–1005, p. 4 ("*People* v *Payne*, 386 Mich 84, 191 NW2d 375 (1971) expressly withheld ruling on the retroactivity of *Pearce* but applied it to *Payne* to instruct the lower courts in Michigan").

the fact that the case was remanded for further proceed-
ings, not a word in our *Payne* opinion suggests that the
Court intended to prohibit state courts from applying new
constitutional standards in a broader range of cases than
we require.[21]

Notably, at least some state courts continued, after
*Payne*, to adopt and apply broader standards of retroactiv-
ity than required by our decisions. In *Pennsylvania* v.
*McCormick*, 359 Pa. Super. 461, 470, 519 A. 2d 442, 447
(1986), for example, the Superior Court of Pennsylvania
chose not to follow this Court's nonretroactivity holding in
*Allen* v. *Hardy*, 478 U. S. 255 (1986) *(per curiam)*. The
Pennsylvania court correctly explained that our decision
was "not binding authority [in part] because neither the
federal nor the state constitution dictate which decisions
must be given retroactive effect." 359 Pa. Super., at 470,
519 A. 2d, at 447.

B

In *American Trucking Assns., Inc.* v. *Smith*, 496 U. S.
167, petitioners challenged the constitutionality of an
Arkansas statute enacted in 1983 that imposed a dis-
criminatory burden on interstate truckers. While their
suit was pending, this Court declared a virtually identical
Pennsylvania tax unconstitutional. See *American Truck-
ing Assns., Inc.* v. *Scheiner*, 483 U. S. 266 (1987). Shortly
thereafter, the Arkansas Supreme Court struck down the
Arkansas tax at issue. The primary issue in *Smith* was
whether petitioners were entitled to a refund of taxes that
were assessed before the date of our decision in *Scheiner*.

---

[21] See *American Trucking Assns., Inc.* v. *Smith*, 496 U. S., at 210, n. 4
(STEVENS, J., dissenting) ("*Payne* does not stand for the expansive
proposition that federal law limits the relief a State may provide, but
only for the more narrow proposition that a state court's decision that
a particular remedy is constitutionally required is itself a federal
question").

The Arkansas Court held that petitioners were not entitled to a refund because our decision in *Scheiner* did not apply retroactively.  Four Members of this Court agreed.  The plurality opinion concluded that federal law did not provide petitioners with a right to a refund of pre-*Scheiner* tax payments because *Scheiner* did not apply retroactively to invalidate the Arkansas tax prior to its date of decision.  Four Members of this Court dissented.  The dissenting opinion argued that the case actually raised both the substantive question whether the tax violated the Commerce Clause of the Federal Constitution and the remedial question whether, if so, the petitioners were entitled to a refund.  The dissent concluded as a matter of federal law that the tax was invalid during the years before *Scheiner*, and that petitioners were entitled to a decision to that effect.  Whether petitioners should get a refund, however, the dissent deemed a mixed question of state and federal law that should be decided by the state court in the first instance.

JUSTICE SCALIA concurred with the plurality's judgment because he disagreed with the substantive rule announced in *Scheiner,* but he did not agree with the plurality's reasoning.  After stating that his views on retroactivity diverged from the plurality's "in a fundamental way," JUSTICE SCALIA explained:

"I share [the dissent's] perception that prospective decisionmaking is incompatible with the judicial role, which is to say what the law is, not to prescribe what [the law] shall be.  The very framing of the issue that we purport to decide today—whether our decision in *Scheiner* shall 'apply' retroactively—presupposes a view of our decisions as *creating* the law, as opposed to *declaring* what the law already is.  Such a view is contrary to that understanding of 'the judicial Power,' U. S. Const., Art. III, § 1, which is not only the com-

mon and traditional one, but which is the only one
that can justify courts in denying force and effect to
the unconstitutional enactments of duly elected legis-
latures, see *Marbury* v. *Madison*, 1 Cranch 137
(1803)—the very exercise of judicial power asserted in
*Scheiner*. To hold a governmental Act to be unconsti-
tutional is not to announce that *we* forbid it, but that
the *Constitution* forbids it; and when, as in this case,
the constitutionality of a state statute is placed in is-
sue, the question is not whether some decision of ours
'applies' in the way that a law applies; the question is
whether the Constitution, as interpreted in that deci-
sion, invalidates the statute. Since the Constitution
does not change from year to year; since it does not
conform to our decisions, but our decisions are sup-
posed to conform to it; the notion that our interpreta-
tion of the Constitution in a particular decision could
take prospective form does not make sense. Either
enforcement of the statute at issue in *Scheiner* (which
occurred before our decision there) was unconstitu-
tional, or it was not; if it was, then so is enforcement
of all identical statutes in other States, whether oc-
curring before or after our decision; and if it was not,
then *Scheiner* was wrong, and the issue of whether to
'apply' that decision needs no further attention."
*American Trucking Assns., Inc.* v. *Smith*, 496 U. S., at
201.

Because JUSTICE SCALIA's vote rested on his disagreement
with the substantive rule announced in *Scheiner*—rather
than with the retroactivity analysis in the dissenting
opinion—there were actually five votes supporting the
dissent's views on the retroactivity issue. Accordingly, it
is the dissent rather than the plurality that should inform

our analysis of the issue before us today.[22]

Moreover, several years later, a majority of this Court explicitly adopted the *Smith* dissent's reasoning in *Harper* v. *Virginia Dept. of Taxation*, 509 U. S. 86 (1993). *Harper*, like *Smith*, involved a request for a refund of taxes paid before we declared a similar Michigan tax unconstitutional. We held that the Virginia tax at issue in *Harper* was in fact invalid—even before we declared the similar tax unconstitutional—but that this did not necessarily entitle the petitioners to a full refund. We explained that the Constitution required Virginia to "'provide relief consistent with federal due process principles,'" 509 U. S., at 100 (citing *American Trucking Assns., Inc.* v. *Smith,* 496 U. S., at 181), but that "'a State found to have imposed an impermissibly discriminatory tax retains flexibility in responding to this determination'" under the due process clause, 509 U. S., at 100 (citing *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regulation,* 496 U. S. 18, 39–40 (1990)). We left to the "Virginia courts this question of state law and the performance of other tasks pertaining to the crafting of any appropriate remedy." 509 U. S., at 102. And we specifically noted that Virginia "'is free to choose which form of relief it will provide, so long as that relief satisfies the minimum federal requirements we have outlined.'" *Ibid.* (citing *McKesson*, 496 U. S., at 51–52); see also 509 U. S., at 102 ("State law may provide relief beyond the demands of federal due process, but under no circumstances may it confine petitioners to a lesser remedy" citations omitted)).

Thus, to the extent that these civil retroactivity decisions are relevant to the issue before us today,[23] they

–––––––––

[22] While the opinions discussed at great length our earlier cases raising retroactivity issues, none of them suggested that federal law would prohibit Arkansas from refunding the taxes at issue if it wanted to do so.

[23] The petitioners and the dissenters in *American Trucking Assns.,*

support our conclusion that the remedy a state court chooses to provide its citizens for violations of the Federal Constitution is primarily a question of state law. Federal law simply "sets certain minimum requirements that States must meet but may exceed in providing appropriate relief." *American Trucking Assns., Inc.* v. *Smith*, 496 U. S., at 178–179 (plurality opinion). They provide no support for the proposition that federal law places a limit on state authority to provide remedies for federal constitutional violations.

## VI

Finally, while the State acknowledges that it may grant its citizens broader protection than the Federal Constitution requires by enacting appropriate legislation or by judicial interpretation of its own Constitution, it argues that it may not do so by judicial misconstruction of federal law. *Oregon* v. *Hass*, 420 U. S. 714 (1975)—like our early decisions in *Ableman* v. *Booth*, 21 How. 506 (1859), and *Tarble's Case*, 13 Wall. 397 (1872)—provides solid support for that proposition. But the States that give broader retroactive effect to this Court's new rules of criminal

---

*Inc.* v. *Smith* relied heavily on separate opinions authored by Justice Harlan, and on the Court's then-recent opinion in *Griffith,* 479 U. S. 314, supporting the proposition that a new constitutional holding should be applied not only in cases that had not yet been tried, but also in all cases still pending on direct review. The plurality, however, declined to follow *Griffith* because of its view that "there are important distinctions between the retroactive application of civil and criminal decisions that make the *Griffith* rationale far less compelling in the civil sphere." 496 U. S., at 197. While Justice Harlan would probably disagree with the suggestion that the distinction between civil and criminal cases provided an acceptable basis for refusing to follow *Griffith* in the *American Trucking Assns., Inc.* v. *Smith* litigation, see *Mackey,* 401 U. S., at 683, n. 2 (opinion concurring in judgments in part and dissenting in part), if relevant, that same distinction would make it appropriate to disregard the plurality's opinion in *American Trucking Assns., Inc.* v. *Smith* in this case.

procedure do not do so by misconstruing the federal *Teague* standard. Rather, they have developed *state* law to govern retroactivity in state postconviction proceedings. See, *e.g., State* v. *Whitfield*, 107 S. W. 3d 253, 268 (Mo. 2003) ("[A]s a matter of state law, this Court chooses not to adopt the *Teague* analysis . . ."). The issue in this case is whether there is a federal rule, either implicitly announced in *Teague*, or in some other source of federal law, that prohibits them from doing so.

The absence of any precedent for the claim that *Teague* limits state collateral review courts' authority to provide remedies for federal constitutional violations is a sufficient reason for concluding that there is no such rule of federal law. That conclusion is confirmed by several additional considerations. First, if there is such a federal rule of law, presumably the Supremacy Clause in Article V of the Federal Constitution would require all state entities—not just state judges—to comply with it. We have held that States can waive a *Teague* defense, during the course of litigation, by expressly choosing not to rely on it, see *Collins* v. *Youngblood*, 497 U. S. 37, 41 (1990), or by failing to raise it in a timely manner, see *Schiro* v. *Farley*, 510 U. S. 222, 228–229 (1994). It would indeed be anomalous to hold that state legislatures and executives are not bound by *Teague*, but that state courts are.

Second, the State has not identified, and we cannot discern, the source of our authority to promulgate such a novel rule of federal law. While we have ample authority to control the administration of justice in the federal courts—particularly in their enforcement of federal legislation—we have no comparable supervisory authority over the work of state judges. *Johnson* v. *Fankell*, 520 U. S. 911 (1997). And while there are federal interests that occasionally justify this Court's development of common-

law rules of federal law,[24] our normal role is to interpret law created by others and "not to prescribe what it shall be." *American Trucking Assns., Inc.* v. *Smith*, 496 U. S., at 201 (SCALIA, J., concurring in judgment). Just as constitutional doubt may tip the scales in favor of one construction of a statute rather than another, so does uncertainty about the source of authority to impose a federal limit on the power of state judges to remedy wrongful state convictions outweigh any possible policy arguments favoring the rule that respondent espouses.

Finally, the dissent contends that the "end result [of this opinion] is startling" because "two criminal defendants, each of whom committed the same crime, at the same time, whose convictions became final on the same day, and each of whom raised an identical claim at the same time under the Federal Constitution" could obtain different results. *Post,* at 1. This assertion ignores the fact that the two hypothetical criminal defendants did not actually commit the "same crime." They violated different state laws, were tried in and by different state sovereigns, and may—for many reasons—be subject to different penalties. As previously noted, such nonuniformity is a necessary consequence of a federalist system of government.

## VII

It is important to keep in mind that our jurisprudence concerning the "retroactivity" of "new rules" of constitutional law is primarily concerned, not with the question whether a constitutional violation occurred, but with the

---

[24] See *Boyle* v. *United Technologies Corp.*, 487 U. S. 500, 504 (1988) ("[W]e have held that a few areas, involving 'uniquely federal interests,' are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed . . . by the courts—so-called 'federal common law'" (citation omitted)); *United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715 (1979); *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398 (1964).

availability or nonavailability of remedies.  The former is a "pure question of federal law, our resolution of which should be applied uniformly throughout the Nation, while the latter is a mixed question of state and federal law." *American Trucking Assns., Inc.* v. *Smith*, 496 U. S., at 205 (STEVENS, J., dissenting).

A decision by this Court that a new rule does not apply retroactively under *Teague* does not imply that there was no right and thus no violation of that right at the time of trial—only that no remedy will be provided in federal habeas courts.  It is fully consistent with a government of laws to recognize that the finality of a judgment may bar relief.  It would be quite wrong to assume, however, that the question whether constitutional violations occurred in trials conducted before a certain date depends on how much time was required to complete the appellate process.

Accordingly, the judgment of the Supreme Court of Minnesota is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.  As was true in *Michigan* v. *Payne,* the Minnesota Court is free to reinstate its judgment disposing of the petition for state postconviction relief.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

No. 06–8273

---

## STEPHEN DANFORTH, PETITIONER *v.* MINNESOTA

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF MINNESOTA

[February 20, 2008]

CHIEF JUSTICE ROBERTS, with whom JUSTICE KENNEDY joins, dissenting.

Some of our new rulings on the meaning of the United States Constitution apply retroactively—to cases already concluded—and some do not. This Court has held that the question whether a particular ruling is retroactive is itself a question of federal law. It is basic that when it comes to any such question of federal law, it is "the province and duty" of this Court "to say what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). State courts are the final arbiters of their own state law; this Court is the final arbiter of federal law. State courts are therefore bound by our rulings on whether our cases construing federal law are retroactive.

The majority contravenes these bedrock propositions. The end result is startling: Of two criminal defendants, each of whom committed the same crime, at the same time, whose convictions became final on the same day, and each of whom raised an identical claim at the same time under the Federal Constitution, one may be executed while the other is set free—the first despite being correct on his claim, and the second because of it. That result is contrary to the Supremacy Clause and the Framers' decision to vest in "one supreme Court" the responsibility and authority to ensure the uniformity of federal law. Because the Constitution requires us to be more jealous of that

responsibility and authority, I respectfully dissent.

## I

One year after *Teague* v. *Lane*, 489 U. S. 288 (1989)—
our leading modern precedent on retroactivity—*Teague*'s
author explained:

> "The determination whether a constitutional deci-
> sion of this Court is retroactive . . . is a matter of fed-
> eral law.  When questions of state law are at issue,
> state courts generally have the authority to determine
> the retroactivity of their own decisions.  The retroac-
> tive applicability of a constitutional decision of this
> Court, however, 'is every bit as much of a federal
> question as what particular federal constitutional
> provisions themselves mean, what they guarantee,
> and whether they have been denied.'"  *American
> Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167, 177–178
> (1990) (plurality opinion of O'Connor, J.) (quoting
> *Chapman* v. *California*, 386 U. S. 18, 21 (1967); cita-
> tion omitted)).

For that reason, "we have consistently required that state
courts adhere to our retroactivity decisions."  496 U. S., at
178 (citing *Michigan* v. *Payne*, 412 U. S. 47 (1973), and
*Arsenault* v. *Massachusetts*, 393 U. S. 5 (1968) *(per cu-
riam))*.  Even more recently, we held that the "Supremacy
Clause does not allow federal retroactivity doctrine to be
supplanted by the invocation of a contrary approach to
retroactivity under state law."  *Harper* v. *Virginia Dept. of
Taxation*, 509 U. S. 86, 100 (1993) (citation omitted).

Indeed, about the only point on which our retroactivity
jurisprudence has been consistent is that the retroactivity
of new federal rules is a question of federal law binding on
States.  The Court's contrary holding is based on a mis-
reading of our precedent and a misunderstanding of the
nature of retroactivity generally.

## A

As the Court correctly points out, before 1965 we took for granted the proposition that all federal constitutional rights, including rights that represented a break from earlier precedent, would be given full retroactive effect on both direct and collateral review. That all changed with *Linkletter* v. *Walker*, 381 U. S. 618 (1965). In that case, a Louisiana prisoner brought a federal habeas petition arguing that illegally seized evidence was introduced against him at trial in violation of *Mapp* v. *Ohio*, 367 U. S. 643 (1961). *Mapp*, however, had been decided after his conviction became final. We granted certiorari to decide whether the *Mapp* rule "operates retrospectively upon cases finally decided in the period prior to *Mapp*." 381 U. S., at 619–620. In answering this question, we broke from our past practice of assuming full retroactivity, holding that "we are neither required to apply, nor prohibited from applying, a decision retrospectively." *Id.*, at 629. Our analysis turned entirely on the nature and scope of the particular constitutional right at issue: "[W]e must . . . weigh the merits and demerits [of retroactive application] in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Ibid.* Under this framework, we held that *Mapp* would apply only prospectively. 381 U. S., at 639–640.

The next year, we decided *Johnson* v. *New Jersey*, 384 U. S. 719 (1966). *Johnson* was a direct appeal from the New Jersey Supreme Court's denial of *state* collateral relief. The precise question in *Johnson* was whether the rules announced in *Escobedo* v. *Illinois*, 378 U. S. 478 (1964), and *Miranda* v. *Arizona*, 384 U. S. 436 (1966), would apply to state prisoners whose convictions had become final before those cases were decided. In holding that *Escobedo* and *Miranda* should apply only prospectively, 384 U. S., at 732, we imported *Linkletter*'s mode of

retroactivity analysis into review of state postconviction proceedings, 384 U. S., at 726–727. Finally, in *Stovall* v. *Denno*, 388 U. S. 293 (1967), we announced that, for purposes of retroactivity analysis, "no distinction is justified between convictions now final, as in the instant case, and convictions at various stages of trial and direct review." *Id.*, at 300.

Thus, by 1967, the *Linkletter* analysis was applied in review of criminal convictions, whether final or not. No matter at what stage of proceedings this Court considered a retroactivity question, the issue was decided with reference to the purposes and practical impact of the precise federal right in question: "Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine [to decide the retroactivity issue] must inevitably vary with the [constitutional] dictate involved." *Johnson*, *supra*, at 728.

Because the question of retroactivity was so tied up with the nature and purpose of the underlying federal constitutional right, it would have been surprising if any of our cases had suggested that States were free to apply new rules of federal constitutional law retroactively even when we would not. As one of the more thoughtful legal scholars put it in discussing the effect of the *Linkletter* analysis on state collateral review, "[i]f a state gave relief in such a case on the exclusive authority of *Mapp*, under the rationale of the *Linkletter* opinion it would presumably have been reversed." Mishkin, Foreword: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56, 91, n. 132 (1965).

Our precedents made clear that States could give greater substantive protection under their own laws than was available under federal law, and could give whatever retroactive effect to *those* laws they wished. As the Court

explained in *Johnson*, "[o]f course, States are still entirely free to effectuate under their own law stricter standards than those we have laid down and to apply those standards in a broader range of cases than is required by this decision." 384 U. S., at 733. The clear implication of this statement was that States could apply their own retroactivity rules only to new substantive rights "under their own law," not to new federal rules announced by this Court.

Thus, contrary to the Court's view, our early retroactivity cases nowhere suggested that the retroactivity of new federal constitutional rules of criminal procedure was anything other than "a matter of federal law." *Daniel* v. *Louisiana*, 420 U. S. 31, 32 (1975) *(per curiam)*. It is no surprise, then, that when we held that a particular right would not apply retroactively, the language in our opinions did not indicate that our decisions were optional. See, *e.g.*, *Fuller* v. *Alaska*, 393 U. S. 80, 81 (1968) *(per curiam)* (the rule announced in *Lee* v. *Florida*, 392 U. S. 378 (1968), "*is to be applied* only to trials in which the evidence is sought to be introduced after the date of [that] decision" (emphasis added)). And, of course, when we found that a state court erred in holding that a particular right should not apply retroactively, the state court was bound to comply. See, *e.g.*, *Kitchens* v. *Smith*, 401 U. S. 847 (1971) *(per curiam)*; *McConnell* v. *Rhay*, 393 U. S. 2, 3–4 (1968) *(per curiam)*; *Arsenault* v. *Massachusetts*, 393 U. S. 5, 6 (1968) *(per curiam)*.

Although nothing in our decisions suggested that state courts could determine the retroactivity of new federal rules according to their own lights, we had no opportunity to confront the issue head on until *Michigan* v. *Payne*, 412 U. S. 47 (1973).[1] In *Payne*, the defendant had argued

———————

[1] *Payne* came to us on direct appeal, but as noted, *supra*, at 4, we did not at the time distinguish between direct appeal and collateral review

before the Michigan Supreme Court that his resentencing
violated the rule we had announced in *North Carolina* v.
*Pearce*, 395 U. S. 711 (1969). In considering this question,
the state court noted that this Court had "not yet decided
whether *Pearce* is to be applied retroactively." *People* v.
*Payne*, 386 Mich. 84, 90, n. 3, 191 N. W. 2d 375, 378, n. 2
(1971). Nevertheless, without so much as citing any fed-
eral retroactivity precedent, the court decided that it
would "apply *Pearce* in the present case in order to in-
struct our trial courts as to the Michigan interpretation of
an ambiguous portion of *Pearce* . . . , pending clarification
by the United States Supreme Court." *Id.,* at 91, n. 3, 191
N. W. 2d, at 378, n. 2.

We granted certiorari in *Payne* only on the question of
retroactivity, and decided that *Pearce* should not apply
retroactively. In reversing the contrary decision of the
state court, our language was not equivocal: "Since the
resentencing hearing in this case took place approximately
two years before *Pearce* was decided, we hold that the
Michigan Supreme Court erred in applying its proscrip-
tions here." 412 U. S., at 57.

The majority argues that *Payne* did not preclude States
from applying retroactivity rules different from those we
announced; rather, the argument goes, the Michigan
Supreme Court simply elected to follow the federal retro-
activity rule, "pending clarification." See *ante*, at 18–20.
That is certainly a possible reading of *Payne*, but not the
most plausible one. The Michigan Supreme Court did not
purport to rest its decision to apply *Pearce* retroactively on
the federal *Linkletter* analysis, and this Court's reversal is
most reasonably read as *requiring* state courts to apply
our federal retroactivity decisions. Notably, this is not the
first time Members of this Court have debated the mean-
ing of *Payne*, with *Teague*'s author explaining that *Payne*

---

for purposes of retroactivity.

supports the proposition that "we have consistently required that state courts adhere to our retroactivity decisions," *American Trucking*, 496 U. S., at 178 (plurality opinion of O'Connor, J.), and the author of today's opinion disagreeing in dissent, see *id.*, at 210, n. 4 (opinion of STEVENS, J.). But whichever way *Payne* is read, it either offers no support for the majority's position, because the state court simply applied federal retroactivity rules, or flatly rejects the majority's position, because the state court failed to apply federal retroactivity rules, and was told by this Court that it must.

Meanwhile, Justice Harlan had begun dissenting in our retroactivity cases, pressing the view that new rules announced by the Court should be applied in all cases not yet final, without regard to the analysis set forth in *Linkletter*. See *Desist* v. *United States*, 394 U. S. 244, 256–269 (1969); *Mackey* v. *United States*, 401 U. S. 667, 675–702 (1971) (opinion concurring in judgments in part and dissenting in part). In *Griffith* v. *Kentucky*, 479 U. S. 314 (1987), we abandoned *Linkletter* as it applied to cases still on direct review and adopted Justice Harlan's view in such cases. Noting that nonretroactivity on direct appeal "violates basic norms of constitutional adjudication" and that "selective application of new rules violates the principle of treating similarly situated defendants the same," 479 U. S., at 322, 323, we held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, *state or federal*, pending on direct review or not yet final," *id.*, at 328 (emphasis added). Just as in previous cases, *Griffith* by its terms bound state courts to apply our retroactivity decisions.

Two years after *Griffith* was decided, we granted certiorari in *Yates* v. *Aiken*, 484 U. S. 211 (1988). In that case, a South Carolina state habeas court had decided that our decision in *Francis* v. *Franklin*, 471 U. S. 307 (1985), should not be applied retroactively. If the authority of

state courts to apply their own retroactivity rules were
well established under our precedents—as the majority
would have it, see *ante*, at 6–12—this case should have
been easily decided on the ground that whatever the fed-
eral retroactivity rule, the State could adopt its own rule
on the retroactivity of newly announced federal constitu-
tional standards.

Instead, the State argued to this Court "that we should
adopt Justice Harlan's theory that a newly announced
constitutional rule should not be applied retroactively to
cases pending on collateral review unless" the rule meets
certain criteria—the flip side of Justice Harlan's view
about cases on direct review that we had accepted in
*Griffith*. 484 U. S., at 215. Under that approach, the
State argued, *Francis* would not be applied retroactively
on collateral review. 484 U. S., at 215. In response, we
discussed Justice Harlan's "distinction between direct
review and collateral review." *Ibid.* We found, however,
that it was "not necessary to determine whether we should
. . . adopt Justice Harlan's reasoning as to the retroactivity
of cases announcing new constitutional rules to cases
pending on collateral review," *id.*, at 215–216, because
*Francis* did not announce a new rule.

This Court went on, however, to address South Caro-
lina's alternative argument—that it "has the authority to
establish the scope of its own habeas corpus proceedings,"
which would allow it in the case before the Court "to re-
fuse to apply a new rule of federal constitutional law
retroactively in such a proceeding." 484 U. S., at 217.
This argument should sound familiar—whatever the
federal retroactivity rule, a State may establish its own
retroactivity rule for its own collateral proceedings. This
Court rejected that proposition, not only because it did not
regard *Francis* as a new rule, but also because the state
court did not "plac[e] any limit on the issues that it will
entertain in collateral proceedings." 484 U. S., at 218. As

this Court explained, if the state court "consider[s] the merits of the federal claim, it has a duty to grant the relief that *federal law* requires." *Ibid.* (emphasis added).

Given all this, the present case should come out the way it does only if *Teague* changed the nature of retroactivity as a creature of federal law binding on the States, and adopted the argument rejected in *Yates*—that when it comes to retroactivity, a State "has the authority to establish the scope of its own habeas corpus proceedings." *Teague* did no such thing.

B

In *Teague*, we completed the project of conforming our view on the retroactivity of new rules of criminal procedure to those of Justice Harlan. Justice O'Connor's plurality opinion posed the problem by noting, with more than a bit of understatement, that the "*Linkletter* retroactivity standard has not led to consistent results." 489 U. S., at 302. In light of these concerns, and because of "'the important distinction between direct review and collateral review,'" *id.*, at 307 (quoting *Yates*, *supra*, at 215), we generally adopted Justice Harlan's approach to retroactivity on collateral review, 489 U. S., at 310, just as we had previously adopted his approach on direct review in *Griffith*.

The *Linkletter* approach to retroactivity was thus overruled in favor of the Harlan approach in two steps: *Griffith* and *Teague*. There is no dispute that *Griffith* is fully binding on States; a new rule "is to be applied retroactively to all cases, *state or federal*, pending on direct review or not yet final." 479 U. S., at 328 (emphasis added). *Teague* is simply the other side of the coin, and it too should be binding in "all cases, state or federal." The fact that *Linkletter* was overruled in two stages rather than one should not lead to a different result.

Indeed, *Teague* did not purport to distinguish between

federal and state collateral review. Justice O'Connor's opinion noted that "in *Yates* v. *Aiken*, we were asked to decide whether the rule announced in *Francis* v. *Franklin*, should be applied to a defendant on collateral review at the time that case was decided," but that we were able to decide the case on alternative grounds. 489 U. S., at 307 (citations omitted). This citation of *Yates*—a state habeas case—makes clear that *Teague* contemplated no difference between retroactivity of new federal rules in state and federal collateral proceedings. Thus, our unqualified holding—that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced," 489 U. S., at 310—is enough to decide this case.

Moreover, the reasons the *Teague* Court provided for adopting Justice Harlan's view apply to state as well as federal collateral review. The majority is quite right that *Teague* invoked the interest in comity between the state and federal sovereigns. *Id.*, at 308. But contrary to the impression conveyed by the majority, there was more to *Teague* than that. *Teague* also relied on the interest in finality: "Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect." *Id.*, at 309. The Court responds by flatly stating that "finality of state convictions is a *state* interest, not a federal one." *Ante*, at 15. But while it is certainly true that finality of state convictions is a state interest, that does mean it is not also a federal one. After all, our decision in *Griffith* made finality the touchstone for retroactivity of new federal rules, and bound States to that judgment. See 479 U. S., at 328 (new rules are "to be applied retroactively to all cases, *state or federal*, pending on direct

review or not yet final" (emphasis added)).

It is quite a radical proposition to assert that this Court has nothing to say about an interest "essential to the operation of our criminal justice system," without which "the criminal law is deprived of much of its deterrent effect," when the question is whether this interest is being undermined by the very rules of *federal* constitutional procedure that we are charged with expounding. A State alone may "evaluate, and weigh the importance of" finality interests, *ante*, at 15, when it decides which substantive rules of criminal procedure *state law* affords; it is quite a leap to hold, as the Court does, that they alone can do so in the name of the Federal Constitution.

*Teague* was also based on the inequity of the *Linkletter* approach to retroactivity. After noting that the disparate treatment of similarly situated defendants led us in *Griffith* to adopt Justice Harlan's view for cases on direct appeal, the Court then explained that the "*Linkletter* standard also led to unfortunate disparity in the treatment of similarly situated defendants on collateral review." 489 U. S., at 305. See also *id.*, at 316 (the Court's new approach to retroactivity "avoids the inequity resulting from the uneven application of new rules to similarly situated defendants").

This interest in reducing the inequity of haphazard retroactivity standards and disuniformity in the application of federal law is quite plainly a predominantly federal interest. Indeed, it was one of the main reasons we cited in *Griffith* for imposing a uniform rule of retroactivity upon *state* courts for cases on direct appeal. And, more to the point, it is the very interest that animates the Supremacy Clause and our role as the "one supreme Court" charged with enforcing it.

Justice Story, writing for the Court, noted nearly two centuries ago that the Constitution requires "*uniformity* of decisions throughout the whole United States, upon all

subjects within [its] purview." *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 347–348 (1816). Indeed, the "fundamental principle" of our Constitution, as Justice O'Connor once put it, is "that a single sovereign's law should be applied equally to all." Our Judicial Federalism, 35 Case W. Res. L. Rev. 1, 4 (1985). States are free to announce their own state-law rules of criminal procedure, and to apply them retroactively in whatever manner they like. That is fully consistent with the principle that "a single sovereign's law should be applied equally to all." But the Court's opinion invites just the sort of disuniformity in federal law that the Supremacy Clause was meant to prevent. The same determination of a federal constitutional violation at the same stage in the criminal process can result in freedom in one State and loss of liberty or life in a neighboring State.[2] The Court's opinion allows "a single sovereign's law"—the Federal Constitution, as interpreted by this Court—to be applied differently in every one of the several

---

[2] The Court points out that the defendants in such a case are differently situated because they violated the laws of and were tried in different States. *Ante*, at 26. But disparate treatment under substantively different state laws is something we expect in our federal system; disparate treatment under the same Federal Constitution is quite a different matter.

The majority also points out that the rule announced in *Griffith* v. *Kentucky,* 479 U. S. 314 (1987)—that full retroactive application ends with the conclusion of direct appeal—creates its own disuniformity, because finality turns on how quickly a State brings its direct appeals to a close. *Ante*, at 27. The same point was raised by the *Griffith* dissenters, 479 U. S., at 331–332 (opinion of White, J.), and rejected as pertinent by the majority in that case, *id.*, at 327–328. The disuniformity that the majority emphasizes today and the dissenters emphasized in *Griffith* is a necessary consequence of our having chosen a relatively clear rule—finality—to delineate the line between full retroactivity and presumptive nonretroactivity. The relevant point is that whatever inequity arises from the *Griffith* rule, it is based on a balancing of costs and benefits that *this* Court—not 50 different sovereigns—has performed.

States.

Finally, from *Linkletter* through *Johnson* to *Teague*, we have always emphasized that determining whether a new federal right is retroactive turns on the nature of the substantive federal rule at issue. See *Linkletter*, 381 U. S., at 629 (in deciding retroactivity, we "loo[k] to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation"); *Johnson*, 384 U. S., at 728 ("Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine [to decide the retroactivity issue] must inevitably vary with the dictate involved"); *Teague, supra*, at 311–315 (deciding whether rule is applicable to cases on collateral review turns on whether the rule "places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe,'" and whether the rule is an "absolute prerequisite to fundamental fairness that is 'implicit in the concept of ordered liberty'"). That is how we determine retroactivity—by carefully examining the underlying federal right. See, *e.g.*, *Whorton* v. *Bockting*, 549 U. S. \_\_\_, \_\_\_–\_\_\_ (2007) (slip op., at 11–14); *Schriro* v. *Summerlin*, 542 U. S. 348, 353–354 (2004); *Sawyer* v. *Smith*, 497 U. S. 227, 243–245 (1990); *Penry* v. *Lynaugh*, 492 U. S. 302, 318–319 (1989).

When this Court decides that a particular right shall not be applied retroactively, but a state court finds that it should, it is at least in part because of a different assessment by the state court of the nature of the underlying federal right—something on which the Constitution gives this Court the final say. The nature and scope of the new rules we announce directly determines whether they will be applied retroactively on collateral review. Today's opinion stands for the unfounded proposition that while

we alone have the final say in expounding the former, we
have no control over the latter.

## II

The Court's holding is not only based on a misreading of
our retroactivity cases, but also on a misunderstanding of
the nature of retroactivity generally. The majority's deci-
sion is grounded on the erroneous view that retroactivity
is a remedial question. See *ante*, at 26–27 ("It is impor-
tant to keep in mind that our jurisprudence concerning the
'retroactivity' of 'new rules' of constitutional law is primar-
ily concerned, not with the question whether a constitu-
tional violation occurred, but with the availability or
nonavailability of remedies"). But as explained in the lead
opinion in *American Trucking*—penned by the author of
the lead opinion in *Teague*—it is an "error" to "equat[e] a
decision not to apply a rule retroactively with the judicial
choice of a remedy." 496 U. S., at 194 (plurality opinion of
O'Connor, J.). As Justice O'Connor went on to emphasize,
"[n]or do this Court's retroactivity decisions, whether in
the civil or criminal sphere, support the . . . assertion that
our retroactivity doctrine is a remedial principle." *Ibid.*
"While application of the principles of retroactivity may
have remedial effects, they are not themselves remedial
principles. . . . A decision defining the operative conduct or
events that will be adjudicated under old law does not, in
itself, specify an appropriate remedy." *Id.*, at 195. See
also *Lemon* v. *Kurtzman*, 411 U. S. 192, 199 (1973) (plural-
ity opinion) (describing the question of retroactivity as
"whether we will apply a new constitutional rule of crimi-
nal law in reviewing judgments of conviction obtained
under a prior standard," and contrasting this with the
question of the "appropriate scope of federal equitable
remedies").

In other words, when we ask whether and to what ex-
tent a rule will be retroactively applied, we are asking

what law—new or old—will apply. As we have expressly noted, "[t]he *Teague* doctrine . . . does not involve a special 'remedial' limitation on the principle of 'retroactivity' as much as it reflects a limitation inherent in the principle itself." *Reynoldsville Casket Co.* v. *Hyde*, 514 U. S. 749, 758 (1995).

The foregoing prompts a lengthy rejoinder from the Court, to the effect that it is wrong to view retroactivity as a federal choice-of-law question rather than a remedial one. That view, we are told, was rejected by five Justices in *American Trucking* and then by the Court in *Harper*. *Ante*, at 20–24. But the proposition on which five Members of the Court agreed in *American Trucking*, and that the Court adopted in *Harper*, was that the *Griffith* rule of retroactivity—that is, that newly announced constitutional decisions should apply to all cases on direct review—should apply to civil cases as well as criminal. See *American Trucking*, 496 U. S., at 201 (SCALIA, J., concurring in judgment) ("I share JUSTICE STEVENS' perception that prospective decisionmaking is incompatible with the judicial role, which is to say what the law is, not to prescribe what it shall be"); *id.*, at 212 (STEVENS, J., dissenting) ("Fundamental notions of fairness and legal process dictate that the same rules should be applied to all similar cases on direct review"); *Harper*, 509 U. S., at 97 ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review").

Neither JUSTICE SCALIA's concurrence in *American Trucking* combined with the dissent, nor the Court's opinion in *Harper*, resolved that retroactivity was a remedial question. That is why, the year after *American Trucking* was decided, two of the Justices in today's majority could explain:

"Since the question is whether the court should apply the old rule or the new one, retroactivity is properly seen in the first instance as a matter of choice of law, 'a choice . . . between the principle of forward operation and that of relation backward.' *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.*, 287 U. S. 358, 364 (1932). Once a rule is found to apply 'backward,' there may then be a further issue of remedies, *i.e.*, whether the party prevailing under a new rule should obtain the same relief that would have been awarded if the rule had been an old one. Subject to possible constitutional thresholds, the remedial inquiry is one governed by state law, at least where the case originates in state court. See *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167, 210 (1990) (STEVENS, J., dissenting). *But the antecedent choice-of-law question is a federal one where the rule at issue itself derives from federal law, constitutional or otherwise.* See *Smith*, *supra*, at 177–178 (plurality opinion)." *James B. Beam Distilling Co.* v. *Georgia*, 501 U. S. 529, 534–535 (1991) (opinion of SOUTER, J., joined by STEVENS, J.) (citation omitted; emphasis added).

And *Harper* certainly did not view the retroactivity of federal rules as a remedial question for state courts. Quite the contrary: *Harper* held that the "Supremacy Clause does not allow federal retroactivity doctrine to be supplanted by the invocation of a contrary approach to retroactivity under state law," 509 U. S., at 100 (citation omitted), and expressly treated retroactivity and remedy as separate questions, *id.*, at 100–102.

The majority explains that when we announce a new rule of law, we are not "'*creating* the law,'" but rather "'*declaring* what the law already is.'" *Ante*, at 21 (quoting *American Trucking*, *supra*, at 201 (SCALIA, J., concurring in judgment)). But this has nothing to do with the ques-

tion before us. The point may lead to the conclusion that nonretroactivity of our decisions is improper—the position the Court has adopted in both criminal and civil cases on direct review—but everyone agrees that full retroactivity is not required on collateral review. It necessarily follows that we must choose whether "new" or "old" law applies to a particular category of cases. Suppose, for example, that a defendant, whose conviction became final before we announced our decision in *Crawford* v. *Washington*, 541 U. S. 36 (2004), argues (correctly) on collateral review that he was convicted in violation of both *Crawford* and *Ohio* v. *Roberts*, 448 U. S. 56 (1980), the case that *Crawford* overruled. Under our decision in *Whorton* v. *Bockting*, 549 U. S. \_\_\_ (2007), the "new" rule announced in *Crawford* would not apply retroactively to the defendant. But I take it to be uncontroversial that the defendant would nevertheless get the benefit of the "old" rule of *Roberts*, even under the view that the rule not only is but always has been an incorrect reading of the Constitution. See, *e.g.*, *Yates*, 484 U. S., at 218. Thus, the question whether a particular federal rule will apply retroactively is, in a very real way, a choice between new and old law. The issue in this case is who should decide.

The proposition that the question of retroactivity—that is, the choice between new or old law in a particular case—is distinct from the question of remedies has several important implications for this case. To begin with, whatever intuitive appeal may lie in the majority's statement that "the remedy a state court chooses to provide its citizens for violations of the Federal Constitution is primarily a question of state law," *ante*, at 24, the statement misses the mark. The relevant inquiry is not about remedy; it is about choice of law—new or old. There is no reason to believe, either legally or intuitively, that States should have any authority over this question when it comes to which *federal* constitutional rules of criminal procedure to

apply.[3]

Indeed, when the question is what federal rule of decision from this Court should apply to a particular case, no Court but this one—which has the ultimate authority "to say what the law is," *Marbury*, 1 Cranch, at 177—should have final say over the answer. See *Harper*, *supra*, at 100 ("Supremacy Clause does not allow federal retroactivity doctrine to be supplanted by the invocation of a contrary approach to retroactivity under state law" (citation omitted)). This is enough to rebut the proposition that there is no "source of [our] authority" to bind state courts to follow our retroactivity decisions. *Ante*, at 26. Retroactivity is a question of federal law, and our final authority to construe it cannot, at this point in the Nation's history, be reasonably doubted.

Principles of federalism protect the prerogative of States to extend greater rights under their own laws than are available under federal law. The question here, however, is the availability of protection under the Federal Constitution—specifically, the Confrontation Clause of the Sixth Amendment. It is no intrusion on the prerogatives of the States to recognize that it is for this Court to decide such a question of federal law, and that our decision is binding on the States under the Supremacy Clause.

Consider the flip side of the question before us today: If a State interprets its own constitution to provide protection beyond that available under the Federal Constitution, and has ruled that this interpretation is not retroactive,

_____

[3] A federal court applying state law under *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), follows state choice-of-law rules as well, see *Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U. S. 487, 496 (1941). It is not free to follow its own federal rule simply because the issue arises in federal court. By the same token, a state court considering a federal constitutional claim on collateral review should follow the federal rule on whether new or old law applies. It is not free to follow its own state-law view on the question simply because the issue arises in state court.

no one would suppose that a federal court could hold otherwise, and grant relief under state law that a state court would refuse to grant. The result should be the same when a state court is asked to give retroactive effect to a right under the Federal Constitution that this Court has held is not retroactive.

The distinction between retroactivity and available remedies highlights the fact that the majority's assertion "that *Teague*'s general rule of nonretroactivity was an exercise of this Court's power to interpret the federal habeas statute," *ante*, at 13—even if correct—is neither here nor there.[4] While Congress has substantial control over federal courts' ability to grant relief for violations of the Federal Constitution, the Constitution gives us the responsibility to decide what its provisions mean. And with that responsibility necessarily comes the authority to determine the scope of those provisions—when they apply and when they do not.

This proposition—and the importance of the distinction between retroactivity and available remedies—were confirmed when we considered the availability of federal collateral review of state convictions under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). See 28 U. S. C. §2254(d)(1). Whatever control Congress has over federal courts' ability to grant postconviction remedies, the availability or scope of those remedies has no bearing on our decisions about whether new or old law should apply in a particular case. That is why, after

---

[4] The majority's assertion, however, is a bit of an overstatement. *Teague* would be an odd form of statutory interpretation; 28 U. S. C. §2254 is cited once in passing, 489 U. S., at 298, and §2243—the statute that the Court believes *Teague* was interpreting—is not cited at all. As support for its proposition, the Court cites several cases having nothing to do with retroactivity, and numerous concurring and dissenting opinions that did not command a majority. See *ante*, at 14–15, and n. 15.

AEDPA's passage, we view the *Teague* inquiry as distinct from that under AEDPA.  See *Horn* v. *Banks*, 536 U. S. 266, 272 (2002) *(per curiam)* ("While it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review set forth in 28 U. S. C. §2254(d), . . . none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard, or that AEDPA relieves courts from the responsibility of addressing properly raised *Teague* arguments").  The majority today views the issue as simply one of what remedies a State chooses to apply; our cases confirm that the question whether a federal decision is retroactive is one of federal law distinct from the issue of available remedies.

Lurking behind today's decision is of course the question of just how free state courts are to define the retroactivity of our decisions interpreting the Federal Constitution.  I do not see any basis in the majority's logic for concluding that States are free to hold our decisions retroactive when we have held they are not, but not free to hold that they are not when we have held they are.  Under the majority's reasoning, in either case the availability of relief in state court is a question for those courts to evaluate independently.  The majority carefully reserves that question, see *ante*, at 4, n. 4, confirming that the majority regards it as open.

Nor is there anything in today's decision suggesting that States could not adopt more nuanced approaches to retroactivity.  For example, suppose we hold that the Sixth Amendment right to be represented by particular counsel of choice, recently announced in *United States* v. *Gonzalez-Lopez*, 548 U. S. 140 (2006), is a new rule that does not apply retroactively.  Under the majority's rationale, a state court could decide that it nonetheless will apply *Gonzalez-Lopez* retroactively, but only if the defendant

could prove prejudice, or some other criterion we had rejected as irrelevant in defining the substantive right. Under the majority's logic, that would not be a misapplication of our decision in *Gonzalez-Lopez*—which specifically rejected any required showing of prejudice, *id.*, at 147–148—but simply a state decision on the scope of available remedies in state court.  The possible permutations—from State to State, and federal right to federal right—are endless.

*          *          *

Perhaps all this will be dismissed as fine parsing of somewhat arcane precedents, over which reasonable judges may disagree.  Fair enough; but I would hope that enough has been said at least to refute the majority's assertion that its conclusion is dictated by our prior cases. This dissent is compelled not simply by disagreement over how to read those cases, but by the fundamental issues at stake—our role under the Constitution as the final arbiter of federal law, both as to its meaning and its reach, and the accompanying duty to ensure the uniformity of that federal law.

Stephen Danforth's conviction became final before the new rule in *Crawford* was announced.  In *Whorton* v. *Bockting*, 549 U. S. \_\_\_ (2007), we held that *Crawford* shall not be applied retroactively on collateral review.  That should be the end of the matter.  I respectfully dissent.