Filed 5/26/20

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re TOM SMITH<br><br>    on Habeas Corpus. | E073871<br><br>(Super.Ct.No. FSB802363)<br><br>OPINION |

ORIGINAL PROCEEDINGS: Petition for writ of habeas corpus.  Kyle S. Brodie and Gregory S. Tavill, Judges.[1]  Petition denied.

REQUEST FOR JUDICIAL NOTICE:  Granted in part, denied in part.

Michael B. Petersen and Paula M. Mitchell, Loyola Law School Project for the Innocent, for Petitioner.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Michael Pulos and Britton B. Lacy, Deputy Attorneys General, for Respondent.

---

[1]  The Honorable Kyle S. Brodie was the trial judge.  The Honorable Gregory S. Tavill was the superior court judge who ruled on the habeas petition which we reviewed in *In re Tom Smith on Habeas Corpus* (Feb. 6, 2019, E071609).

1

A jury found petitioner guilty of first degree murder, assault by means likely to produce great bodily injury, dependent adult abuse, conspiracy to commit murder, custodial possession of a weapon, custodial manufacture of a weapon, and misdemeanor damage to prison property, along with various enhancements, arising from an attack on a fellow inmate at Patton State Hospital. Petitioner was sentenced to an aggregate term of 168 years to life. He appealed, raising, among other issues, the ineffectiveness of his trial counsel based on defense counsel's closing argument, in which he conceded petitioner's guilt of the crime but asked the jury to find him guilty of second degree murder, rather than first degree. The judgment was affirmed on direct appeal. (*People v. Smith* (Apr. 13, 2012, E052044) [nonpub. opn.] [Hollenhorst, Acting P.J.; King & Codrington, JJ., concurring].) Petitioner did not seek review in our Supreme Court. However, he did file multiple petitions seeking to collaterally attach the judgment.

In May 2018, the U.S. Supreme Court decided *McCoy v. Louisiana* (2018) 584 U.S.__ [138 S.Ct. 1500, 200 L.Ed.2d 821] (*McCoy*). Petitioner filed a habeas petition in superior court re-arguing the issue of his trial counsel's ineffective assistance based on *McCoy,* and, when that petition was denied, he raised the same issue in this appellate court, and we denied the petition. Petitioner then pursued the issue in the Supreme Court, which issued an order to show cause before this court why petitioner is not entitled to

relief pursuant to the holding of *McCoy*, and why *McCoy* should not apply retroactively to final judgments on habeas corpus.[2, 3]  We deny the petition.

## BACKGROUND

We recite the facts as set forth in our original opinion on direct appeal, *People v. Smith*, (nonpub. opn., E052044), filed on April 13, 2012:

In 2005 petitioner was a patient at Patton State Hospital (Patton), where he roomed with Jason Porter, Michael Zamora and Robert Lucas in housing Unit 33.  Petitioner was five feet five inches tall and weighed 260 pounds.  Because he was overweight, he was on a reduced calorie diet and always wore black suspenders to keep his pants up.  He was assigned to the caseload of Psychiatric Technician Marie Rockwell, who had observed him unravel the fabric from his suspenders and attach the string to other objects, like a pen.

On the evening of September 6, 2005, hotdogs were being served for dinner in the dining room at Patton.  Petitioner became upset and enraged that he could not have a second portion, and the staff calmed him down.  After 9:00 p.m., Rockwell saw Porter

---

[2]  Petitioner appended portions of the record to his petition, while respondent requested we take judicial notice of the records in the direct appeal, E052044, *People v. Smith*, as well as petitioner's prior habeas petitions  (*Smith v. Gipson,* EDCV 13-00553 JVS (SS), and *In re Tom Smith,* Case Nos. S204302 and S206819.)  We granted the request for judicial notice as to Case No. E052044, but denied the request as to EDCV 13-00553JVS and Supreme Court cases S204302 and S206819.

[3]  In their return, the People argued, in addition to the question relating to the retroactivity of *McCoy*, that the current claim is procedurally barred.  Although the transfer directed us to consider whether defendant is entitled to relief under *McCoy*, and whether *McCoy* applies retroactively, we address the question of whether a procedural bar applies.

3

run into the main bathroom. Ten or 15 minutes later, Porter came out "hurrying" while putting on a prison-issued khaki button up.

At 10:15 p.m., Albert Rennie, a registered nurse, went to petitioner's room to deliver a CPAP (continuous positive airway pressure) machine for sleep apnea to help petitioner sleep. As he entered the room, Rennie saw petitioner and Porter sitting on the bed whispering to each other while playing loud music. A half-hour later, senior psychiatric technician Mark Carty conducted rounds at housing Unit 33. As he was checking the bathrooms, he saw petitioner and Porter in adjoining stalls, Porter said, "Oh shit. Oh shit." Smith and Porter identified themselves when Carty stated he was doing the count.

However, upon proceeding to Room 33-23, Carty saw Lucas lying on the floor, completely wrapped in bedding with only his ankles showing. The bedding was wet and smelled of urine. Lucas's feet were discolored. Carty touched Lucas's left shoulder but there was no response. Further shaking produced no response from Lucas, who was not breathing. Carty testified there appeared to be "some type of black material wrapped tightly around [Lucas's] neck," which looked like the black suspenders used by heavyset patients at Patton to keep pants up. He saw a "moderate amount of blood spots" on the floor and the wall. Zamora was lying on an upper bed with his eyes closed. Carty notified the nurse's station and Rockwell ran to retrieve the crash cart.

The staff attempted to revive Lucas but was unable to do so. The suspender material wrapped around his neck was so tight the staff had to use a knife to cut it off.

4

Zamora continued to lie in bed during the resuscitation efforts. Rockwell later heard petitioner and Porter talking about how proud they were of killing Lucas. They were unremorseful about killing him, saying they were glad they did it. Petitioner said, "we just wanted to see how it felt to kill someone."

Charles Risch, a police sergeant at Patton, contacted petitioner and Porter and read them their *Miranda*[4] rights. Petitioner agreed to speak. The sergeant separated the two men. Petitioner said, "I killed him. I strangled him with the suspenders." He then said that Porter had stabbed Lucas with a pen and punched him. According to petitioner, he and Porter had been planning for a while to kill Lucas "because he [Lucas] was a child molester." Petitioner said he got blood on his clothes. The sergeant saw blood on the floor of the room. When Sergeant Risch spoke to Porter and read him his rights, Porter admitted he was "in on it" with petitioner and that he (Porter) stabbed Lucas with a pen.

Later, while outside smoking a cigarette, petitioner told Officer Donald Sumner, an investigator at Patton, "I did it." Petitioner said he used the suspenders and wrapped them around Lucas's head and face. He said the suspenders initially were in Lucas's mouth, but he was making a noise, so petitioner wrapped them around Lucas's head and face again. When petitioner made this statement, he made a circular twisting motion with his hand to indicate how he had wrapped the suspenders around Lucas's head and face. Petitioner said the second wrap of suspenders caused Lucas to begin to lose his breath.

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

5

During the early morning of September 7, 2005, homicide detectives David Dillon and William Flesher of the San Bernardino Police Department investigated the homicide of Lucas at Patton, collecting evidence. Detective Dillon spoke to Zamora, who said he had not been threatened. Detective Flesher conducted a tape-recorded interview with petitioner, which was played for the jury. In the interview, petitioner admitted killing Lucas because, among other reasons, Lucas was a bully. Petitioner described Lucas lying on his side in bed. Petitioner said, "Hale [*sic*] Satan." Petitioner described tying the material around Lucas's mouth and neck. Zamora was sleeping but got up when he heard the commotion and asked what was going on. Porter told Zamora to go back to bed. Zamora was scared, so he complied.

In response to Lucas struggling, petitioner wrapped the material a second, and then a third time, around Lucas's neck, and they tied a knot. They put a blanket on Lucas and then urinated on him. Porter was laughing and said they were going to prison, where they would drink "real coffee" and be with his "Arian [*sic*] brothers." Petitioner said he was not high on drugs when he killed Lucas.

During the interview, petitioner stated that while Porter's excuse for killing Lucas was that Lucas was a child molester, petitioner did not know if this was true. Petitioner stated that petitioner is a sex offender who "caught a[n] assault with intent to commit rape on a grown woman . . ." in 1992. Petitioner felt a bond toward Porter, who gave petitioner money and liked the same kind of music. Petitioner wanted to tell the district attorney that he was guilty, but not guilty by reason of insanity, because he heard Satan's

6

voice when it was actually Porter that he was hearing. Although petitioner thought he had to do what Porter told him to do when he killed Lucas, petitioner admitted it was his fault that they killed Lucas. Based on the autopsy of Lucas, the medical examiner opined that Lucas's death was a homicide caused by ligature strangulation.

On May 1, 2009, during a cell check at West Valley Detention Facility (West Valley), Deputy Sheriff Guillermo Macias of the San Bernardino County Sheriff's Department saw a shank on top of a desk in petitioner's cell. The shank was made from an inmate-issued comb that was sharpened to a point, and strings of a bedding sheet were used to form a handle. The deputy also saw that the sheet had been ripped and pieces were removed. When Deputy Macias held up the shank, petitioner said, "that's mine." After being read his *Miranda* rights, petitioner admitted he had made the shank two days prior to the cell check. Petitioner claimed that he was using the shank as protection against other inmates; however, he would not reveal the names of the inmates from whom he needed protection. The deputy was unaware of any trouble with petitioner at the jail.

At trial, defense counsel did not give an opening statement. Petitioner testified in his own defense. He denied killing Lucas, claiming it was Zamora and Porter who did it. He said he was going to leave, but Porter threatened to get him too if he did. Petitioner stated he helped them wipe up the blood with his clothes, and Zamora said he was returning to bed because he was medicated and "d[id]n't know shit." Petitioner went to the bathroom to change clothing and was "panicking" because he did not have a change

7

of clothes. Petitioner testified he and Porter planned what they were going to say to the police. During cross-examination, petitioner said that at least half of what he said to Detective Flesher was a lie.

In rebuttal, Ronnie Paez testified that he was in custody with petitioner at West Valley. Petitioner told Paez that he strangled the victim from behind, and it turned him on sexually. Petitioner also said that Porter had stabbed the victim while petitioner was strangling him. Petitioner told Paez that he (petitioner) was going to lie and tell the court or jury the only reason he had admitted killing the victim the day of the incident was because they were treating him badly at the hospital. Petitioner also told Paez that he (petitioner) had a prior conviction; that if he could win at trial, he would go back to attack and rape other women as he had done in the past.

During closing argument, the prosecutor stated that the evidence was like a "documentary" about how Lucas was strangled to death by petitioner and Porter, how petitioner detailed the murder to the detective, and how petitioner used skills to make the tools necessary to kill Lucas. Interrupting the prosecution's closing argument, petitioner told the court that he wanted to leave the courtroom. He stated: "It's just been so long, your Honor. I'm tired of hearing it. I didn't do it." Defense counsel wanted petitioner to be present, so the trial court denied petitioner's request and asked him to "hold it together." The prosecutor resumed, arguing there was no second degree murder; rather, all the charges, including first degree murder, had been proven.

8

Next, defense counsel argued, telling the jury: "Well, my job just got harder because after the documentary, I found out what my documentary is going to be. But I'll carry on. [¶] For all of you parents out there let me offer you some advice for a certain few who might meet this criteria in terms of for a job description. Undeterred by impossible odds. Ready to change your story at the drop of a hat. The ability to look 12 citizens in the eye and look sincere. Doesn't mind losing once in a while. That would be a defense lawyer. And welcome to the defense bar."

Defense counsel then reminded the jury about the presumption of innocence and the prosecutor's burden of proof. He argued his belief that this was a second degree murder, not a first degree murder case. At that point, petitioner interjected, "Did I understand him correct? Did he just say—" The trial court asked petitioner to be quiet. Petitioner stated, "He said second-degree murder. I said I didn't do it. [¶] . . . [¶] I object to that."

Defense counsel continued arguing second degree murder because there was no premeditation and deliberation as evidenced by Porter's statement to petitioner that now they would get hot coffee and get to fight and reap their reward for being sent to state prison.[5] Defense counsel argued that the prosecution could not prove first degree murder because that discussion between petitioner and Porter demonstrated a lack of

---

[5] The jury had heard petitioner's taped interview with the detective, where petitioner said, "Porter was laughin' and said, 'Ha, we're goin' to prison now. . . . We gonna drink some real coffee . . .' . . . I was confused, man, you know what I'm sayin'? I couldn't believe what was happenin' but all's I remember now was lookin' at . . . Lucas'[s] face. . . . And it was nothin' funny, man. It wasn't . . . nothin' nice, you know."

premeditation and deliberation and there was no one else present when Lucas was killed. The following exchange occurred:

"THE DEFENDANT: And that's my lawyer saying that.

"THE COURT: Mr. Smith—

"THE DEFENDANT: I want to go back to my holding cell, man. I'm tired of this bull shit. I don't want to be here, homie.

"THE COURT: Mr. Smith—

"THE DEFENDANT: I don't care. I don't want to listen to that bull shit. I did not commit murder. I didn't kill that son of a bitch.

"THE COURT: Take Mr. Smith out of the courtroom.

"THE DEFENDANT: Thank you. You lying sack of shit."

Defense counsel then concluded his argument, as follows: "You take your clients as you find them, okay. Despite his actions, despite his outbursts, despite his numerous problems, remember this is still a guy that it seems like the guy never caught—you can't consider sympathy in your deliberations—but I can't think of a time in this guy's life when he caught a break. And I would like you to disregard his outbursts and think about the facts, that it took two people to hold and do the poking. And find him guilty of second-degree murder instead of first. Thank you."

On direct appeal, petitioner argued that the closing argument of defense counsel violated his right to effective assistance of counsel for abandoning his claim of innocence and conceding guilt on second degree murder, along with a related claim not relevant

10

here. On April 13, 2012, we rejected this argument because the concession was tactically justifiable, relying on *People v. Gamache* (2010) 48 Cal.4th 347, 392-393, and its progeny. Petitioner did not file a petition for review, so that judgment became final. Petitioner filed multiple post-conviction collateral attacks on the judgment arguing he was deprived of effective assistance of counsel when his attorney argued to the jury that it should convict him of second degree murder, not first, but each was denied in turn.

Petitioner now seeks to collaterally challenge his conviction based on the recent decision by the United States Supreme Court in *McCoy*. The trial court denied his petition for writ of habeas corpus, and we also summarily denied it (*In re Tom Smith on Habeas Corpus* [Feb. 6, 2019, E071609]). The California Supreme Court has issued an order to show cause before this court why petitioner is not entitled to relief under *McCoy*, and why *McCoy* should not be applied retroactively.

## DISCUSSION

The California Supreme Court has transferred this matter, directing us to determine whether petitioner is entitled to relief from his conviction based on the United States Supreme Court decision in *McCoy, supra*, 584 U.S.__ [138 S.Ct. 1500, 200 L.Ed.2d 821] and whether the holding of *McCoy* applies retroactively to cases that were already final at the time of the decision in *McCoy*. Petitioner asserts that *McCoy* is retroactive and that it applies to his case. Respondent argues that the claim is procedurally barred, not retroactive, and inapplicable to the facts of this case.

11

Because the Supreme Court transferred the case to us specifically to address the substantive issues of whether *McCoy* applies to the facts of this case and whether it is retroactive, and because the issuance of an order to show cause indicates the Supreme Court has determined the claim is not procedurally barred (see *Maas v. Superior Court* (2016) 1 Cal.5th 962, 974; *In re Coley* (2012) 55 Cal.4th 524, 537; *In re Large* (2007) 41 Cal.4th 538, 548-549), we address the merits only.

A.      *Whether Petitioner is Entitled to Relief Under McCoy*

Petitioner argues that *McCoy* applies to his case because it is clear from the record that defendant wanted to assert his innocence at trial, and made that fact known to his trial counsel, but counsel conceded his guilt anyway. According to petitioner, his trial testimony demonstrated his intent to assert his innocence of the murder, as did his statements made in open court after counsel's closing argument. We disagree.

In *McCoy, supra*, the defendant was convicted of three counts of first degree murder and sentenced to death. (*McCoy*, 584 U.S. at p. ___ [138 S.Ct. at p. 1507].) The defense strategy was to concede that defendant had committed the murders, and to argue he should be convicted of second degree murder because his mental capacity precluded him from forming the requisite intent to commit first degree murder. (*Id.*, at p.___ , fn. 1 [138 S.Ct. at p. 1506].) However, throughout the proceedings, the defendant "insisted" on maintaining his factual innocence. (*Id.* at p. ___ [138 S.Ct. at p. 1510].)

Two weeks prior to trial, defense counsel informed the defendant that the evidence against defendant was overwhelming, and, absent a concession of guilt, the death penalty

12

was inevitable at the penalty stage. (*McCoy, supra,* 584 U.S. at p.___[138 S.Ct. at p. 1506].) The defendant was "'furious'" and explicitly instructed his counsel not to make the concession. (*Ibid.*) Two days prior to trial, defendant sought to terminate the attorney's representation and the attorney requested to be relieved, but the trial court denied the defendant's request for new counsel. (*Ibid.*)

At the inception of his trial, McCoy's counsel made an opening statement arguing that after hearing the prosecution's evidence, there was "no way reasonably possible" for the jury to conclude anything except that defendant was the cause of the victims' deaths. (*McCoy, supra,* 584 U.S. at p. ___ [138 S.Ct. at pp. 1506-1507].) Defendant protested. Defendant testified in his own defense that he was innocent and relied on an alibi defense described as "difficult to fathom." (*Id.,* at p. 1507.) In closing argument, defense counsel again conceded defendant killed the victims (*ibid.*), yielding three first degree murder convictions. (*Ibid.*) At the penalty stage, defense counsel urged the jury to have mercy, but the jury returned three death verdicts. (*Ibid.*)

The trial court in *McCoy* denied the defendant's subsequent motion for a new trial, reasoning that, despite the defendant's opposition, defense counsel had authority to concede guilt because it was reasonable to believe that this strategy presented the best chance to avoid a death sentence. (*McCoy, supra*, 584 U.S. at p. ___ [138 S.Ct. at p. 1507].) After that ruling was affirmed by the Louisiana Supreme Court, the United States Supreme Court reversed, holding that it violated the Sixth Amendment to "allow defense counsel to concede guilt over the defendant's intransigent and unambiguous objection."

13

(*Ibid.*)  The court reasoned that while "[t]rial management is the lawyer's province," including decisions as to "'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence,'" a criminal defendant is entitled to "[a]utonomy to decide that the objective of the defense is to assert innocence" and to "insist on maintaining her innocence at the guilt phase of a capital trial."  (*Id*., at p. 1508.)

In reaching its conclusion, the United States Supreme Court acknowledged its prior holding in *Florida v. Nixon* (2004) 543 U. S. 175 [125 S.Ct. 551, 160 L.Ed. 2d 565] (*Nixon*), where it considered whether the Constitution bars defense counsel from conceding a capital defendant's guilt at trial "when [the] defendant, informed by counsel, neither consents nor objects."  (*Id.,* at p. 178.)  In that case, defense counsel had several times explained to the defendant a proposed guilt-phase concession strategy, but the defendant was unresponsive.  (*Id*., at p. 186.)

The United States Supreme Court held that when counsel confers with the defendant and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy, "[no] blanket rule demand[s] the defendant's explicit consent" to implementation of that strategy.  (*Nixon, supra*, 543 U.S. at pp. 181, 192.)  Thus, "[i]f a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest," but, when "[p]resented with express statements of the client's will to maintain

14

innocence, . . . counsel may not steer the ship the other way." (*McCoy, supra,* 584 U.S. at p. ___ [138 S.Ct. at p. 1509].)

*McCoy* makes clear, however, that for a Sixth Amendment violation to lie, a defendant must make his intention to maintain innocence clear to his counsel, and counsel must override that objective by conceding guilt. (*McCoy, supra*, 584 U.S. at p. ___ [138 S.Ct. at p. 1509].) In fact, the Court framed the issue as "whether it is unconstitutional to allow defense counsel to concede guilt over the defendant's *intransigent and unambiguous objection*." (*McCoy, supra,* 584 U.S. at p. ___ [138 S.Ct. at p. 1507, italics added].)

Applying these principles, in *People v. Franks* (2019) 35 Cal.App.5th 883, the Third District Court of Appeal affirmed a voluntary manslaughter conviction and sentence on direct appeal where counsel implicitly conceded guilt at closing argument to the jury but where defendant had not previously made it clear that the objective of his defense was to maintain innocence. Citing *McCoy,* the *Franks* court held that although defendant denied guilt during police interviews and expressed a desire to review discovery to fight the prosecution's evidence, nothing in the record indicated he ever made it clear to his counsel or the court that the objective of his defense was to maintain innocence, or that he "voiced 'intransigent objection'" to the attorney's defense strategy. (*Franks, supra,* 35 Cal.App.5th at p. 891.) Instead, defendant had refused to speak with counsel during their six meetings to discuss the case. (*Ibid.*)

Similarly, in *People v. Bernal* (2019) 42 Cal.App.5th 1160, where defense counsel conceded guilt on some charges during closing argument to the jury, the court rejected an argument that *McCoy* required reversal. There, the court held, "*McCoy* does not assist defendant because the record here does not reflect a directive to counsel that defendant's objective at trial was to maintain innocence on all charges. There is no indication that defendant instructed counsel not to concede guilt on the relevant charges in closing argument, nor did he ask to replace appointed counsel because of disagreement over trial strategy." (*Bernal, supra,* 42 Cal.App.5th at p. 1166.)

Contrast *Franks* and *Bernal* with the situation in *People v. Eddy* (2019) 33 Cal.App.5th 472, where the defendant made a motion to substitute new counsel to represent him pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, after his attorney made closing argument, conceding defendant had committed the crime of voluntary manslaughter. However, counsel's opening statement established defendant's initial strategy of factual innocence, and, after the closing statement, defendant complained to the court that he disagreed with counsel's abandonment of the factual innocence defense and counsel's refusal to allow defendant to testify in his own defense. (*People v. Eddy, supra,* 33 Cal.App.5th at pp. 477-478.)

The Court of Appeal concluded that the defendant's statements during the *Marsden* hearing made it clear the defendant had instructed his attorney not to concede manslaughter and that counsel had overridden that directive. (*People v. Eddy, supra,* 33 Cal.App.5th at p. 482.) In reaching its conclusion, the court reasoned that *McCoy* applied

16

even though the defendant did not object during the argument. Instead, it held that "the record must show (1) that the defendant's plain objective is to maintain his innocence and pursue an acquittal, and (2) that trial counsel disregards that objective and overrides his client by conceding guilt." (*People v. Eddy, supra,* at pp. 482-483, citing *McCoy*, *supra*, 584 U.S. at pp. ___, ___[138 S.Ct. at pp. 1505, 1507-1510].)

In *People v. Flores* (2019) 34 Cal.App.5th 270, the defendant made his objective known and was unambiguous in wanting to maintain his innocence of the acts alleged irrespective of the weight of the evidence against him. Specifically, defendant objected to his counsel's decision to admit that Flores was driving the car that seriously injured a police officer, and to focus the defense on whether defendant had formed the premeditated intent to kill requisite for attempted murder. In a subsequent trial on weapons possession charges, counsel adopted a similar approach, conceding that defendant possessed the weapons but arguing that the possession was not "knowing."

The reviewing court held that in the pursuit of the understandable objective of achieving an acquittal, counsel conceded the actus reus of the charged crimes at both trials, which, while "any reasonable lawyer might agree with counsel's judgment, *McCoy* instructs that this is a decision for the client to make." (*Flores, supra,* 34 Cal.App.5th at p. 273.)

Here, upon his arrest, petitioner made a full confession at the police station, and at trial, defense counsel did not give an opening statement. Petitioner testified in his own defense that he did not kill the victim, but, rather, Zamora and Porter did it and that his

confession was a lie. In rebuttal, the People introduced a witness who had been in custody with petitioner and to whom petitioner had confessed strangling the victim and that he planned to lie at trial.

During the prosecution's summation to the jury, arguing for a verdict of first degree murder, petitioner interrupted and complained he wanted to leave the courtroom and that he did not do it. The court had called counsel to an off-the-record sidebar to discuss "chatter" between defendant and defense counsel, and to insure it was not distracting the prosecutor during his summation. There is no indication that a discussion of defense strategy occurred during this discussion; in fact, petitioner, in his declaration in support of his traverse, denies that defense counsel informed him of a proposed change of strategy during the prosecutor's closing argument.

After the prosecutor's argument resumed and ultimately concluded, defense counsel commenced his closing argument, in which he told the jury that defense counsel had to be ready to change his story at the drop of a hat and continued by saying he believed this was second degree murder. At this point, petitioner objected, insisted he did not do it, and informed the court he did not wish to be present, after accusing his attorney of lying.

The trial court excused the jury for the day in order to make a record of what had transpired. During that discussion, counsel indicated that after the prosecutor's argument, he informed petitioner that he believed there was no way the jury would buy his defense that he did not do it, based on all that had been said, and that he was going to go with the

18

best defense he could. The record does not show petitioner made an express and unambiguous intent to maintain factual innocence at that time. Thereafter, defense counsel made his closing argument, conceding petitioner's involvement in the murder, at which point petitioner objected.

Under these circumstances, the *McCoy* decision does not apply because petitioner did not object or seek to substitute counsel *prior* to the defense counsel's closing argument. He did not "vociferously insist" that he did not engage in the charged acts *prior* to counsel's argument, although he had been made aware of the change of strategy, and he did not "adamantly object[] to any admission of guilt" when informed, before the defense closing argument, that the jury would not buy it.

In this respect, petitioner's case is similar to *Nixon*, *Franks*, and *Bernal*, because defendant did not object and make plain his objective of maintaining his innocence after his attorney advised him that the jury would not buy his defense that he did not do it, and before defense counsel presented closing argument. Nor did petitioner object when counsel informed him he would adopt a different approach, which also occurred prior to closing argument. While petitioner did object during closing argument, it was after the concession had been made, so it cannot be said that at the time counsel made the concession, it was over petitioner's intransigent and unambiguous objection.

*McCoy* does not apply to petitioner's case.

19

B.     *Retroactivity of McCoy v. Louisiana*

Petitioner argues that *McCoy* is entitled to retroactive effect as to final judgments on collateral review under *Teague v. Lane* (1989) 489 U.S. 288 [109 S.Ct. 1060, 103 L.Ed.2d 334](*Teague*) because it was dictated by pre-existing precedent.    If a case does not announce a new rule, then it is retroactive under both federal and California state law. (*Chaidez v. United States* (2013) 568 U.S. 342, 347; *People v. Guerra* (1984) 37 Cal.3d 385, 399.)

Under federal constitutional principles, when a Supreme Court decision results in a new constitutional rule, this rule applies to all criminal cases pending on direct review but applies to convictions that are already final only in limited circumstances.  (See *Schriro v. Summerlin* (2004) 542 U.S. 348, 351 [124 S.Ct. 2519, 159 L.Ed. 2d 442](*Schriro*).)  In deciding retroactivity issues, a court must first find whether the Supreme Court decision in question announced a "new rule."  (*Teague, supra,* 489 U.S. at pp. 300-301.)  If a court determines that a Supreme Court decision announces a new constitutional rule, it must then determine whether that new rule satisfies an exception to the general prohibition against the retroactive application of new rules to cases on collateral review.  (*Teague, supra*, 489 U.S. at pp. 305-310.)  New substantive rules generally apply retroactively, while new rules of criminal procedure generally do not. (*Schriro, supra*, 542 U.S. at pp. 351-52.)

State courts are "'free to give greater retroactive impact to a decision than the federal courts choose to give.'"  (*In re Gomez* (2009) 45 Cal.4th 650, 655, fn. 3, citing *In*

*re Johnson* (1970) 3 Cal.3d 404, 415; see *Danforth v. Minnesota* (2008) 552 U.S. 264 [169 L.Ed. 2d 859, 128 S.Ct. 1029].)  Thus, in the event *McCoy* is determined to have created a new rule, it may nevertheless apply retroactively to his final judgment applying the three-factor test for retroactivity applicable under California law, as set forth in *Guerra*.

The question is whether *McCoy* created a new rule.  In *Guerra,* the California Supreme Court noted that "[t]he most common examples of decisions that do not establish a new rule of law in this sense are those which explain or refine the holding of a prior case, those which apply an existing precedent to a different fact situation, even if the result may be said to "extend" the precedent, or those which draw a conclusion that was clearly implied in or anticipated by previous opinions."  (*People v. Guerra, supra,* 37 Cal.3d at p. 399, citing as examples, *People v. Superior Court* (*Kiefer*) (1970) 3 Cal.3d 807, explained in *Gallik v. Superior Court* (1971) 5 Cal.3d 855, 859-860.)

The holding of *McCoy* extended the precedent under *Nixon, supra,* 543 U.S. 175, drawing a conclusion clearly implied in or anticipated by that opinion.  *Nixon* established the parameters of a claim of ineffective assistance of counsel where counsel makes a strategic decision to concede guilt in order to avoid harsher consequences where the defendant never asserted a defense objective of maintaining innocence and never verbally approved or protested counsel's proposed approach.  *McCoy,* on the other hand, held that *Nixon* and *Strickland* do not apply where counsel's decision overruled the defendant's unambiguous and intransigent objection to that admission, usurping the defendant's

21

prerogative to choose the object of his defense and to decide whether to maintain his innocence.

*McCoy* interpreted and extended the rule of *Nixon* to provide guidance in situations where the defendant expressly objects to counsel's strategy of conceding guilt. Defendant argued on direct appeal that his trial attorney deprived him of his Sixth Amendment right to effective assistance of counsel by conceding his guilt of second degree murder. In this respect, we conclude that *McCoy* did not announce a new rule. Instead it was foreshadowed by *Nixon* and is entitled to retroactive application. Nevertheless, for the reasons stated above, it does not apply to petitioner.

### DISPOSITION

The petition is denied.

CERTIFIED FOR PUBLICATION

RAMIREZ

P. J.

We concur:

FIELDS

J.

RAPHAEL

J.